STATE v. SEYBOLDT.

No. 4166. Decided April 1, 1925. (236 P. 225.)

1. JURY—REFUSAL TO ISSUE NEW VENIRE, BECAUSE SOME JURORS SAT IN ANOTHER CASE IN WHICH JURORS WERE REPRIMANDED FOR RECOMMENDING LIFE SENTENCE, HELD NOT ERROR. Objection to venire, because 12 jurors had been in another case, in which court reprimanded jurors for recommending a life sentence, was not a valid objection to panel under Comp. Laws 1917, § 8940, but rather went to bias of jurors, which could only be reached by examination of individual jurors, and where defendant failed to avail himself of such individual examination, court did not err in refusing to issue a new venire.

Appeal from Third District

2. JURY—TRIAL COURT'S DISCRETION IN DETERMINING QUALIFICA-
TION OF JURORS NOT ARBITRARY. Though trial judge has wide
discretion in determining qualification of juror when examined
as to his bias, it is not an arbitrary discretion.

3. JURY—DISMISSAL OF JUROR BY COURT OF ITS OWN MOTION WITH-
OUT APPARENT CAUSE HELD ERROR. Trial court's dismissal of
its own motion of a juror in a murder prosecution, without
apparent cause, held error, where juror's answers were fair
and to the point, and showed him to be qualified to serve.

4. CRIMINAL LAW—COURT MUST BE SATISFIED THAT ERROR IS PREJU-
DICIAL BEFORE REVERSAL WARRANTED. Supreme Court will not
presume prejudice from error, and, under Comp. Laws 1917,
§ 9231, on appeal in criminal cases, court must go further than
mere finding of error, and must be satisfied that error is
prejudicial, before it is warranted in reversing judgment.[1]

5. CRIMINAL LAW—ERRONEOUS DISMISSAL OF JUROR BY COURT OF
ITS OWN MOTION WITHOUT APPARENT CAUSE HELD NOT PREJU-
DICIAL ERROR. Though trial court's dismissal, on its own mo-
tion and without apparent cause, of a juror in murder prose-
cution, was erroneous, such error was not prejudicial, where
examination of juror disclosed nothing from which it could
be determined that defendant would be prejudiced by requir-
ing juror to stand aside.

6. CRIMINAL LAW—CONTINUANCE FOR PUBLIC PREJUDICE HELD PROP-
ERLY DENIED. Where defendant's counsel in murder prosecu-
tion endeavored to get continuances on ground that they were
not prepared to go to trial, but said nothing about public
prejudice against defendant, and affidavit of defendant in sup-
port of his subsequent motion for continuance, because of
public prejudice, was fairly answered by affidavits in behalf of
state, held that court did not err in denying a continuance.[2]

7. CRIMINAL LAW—REFUSAL TO CONFINE JURY IN CAPITAL CASE
DISCRETIONARY WITH TRIAL COURT. Where trial court in mur-
der prosecution, at each recess and adjournment, gave jury
statutory admonition against conversing about case, and it
was not shown that such admonition was not strictly observed,
held that, under Comp. Laws 1917, § 9001, it was entirely

[1] *State* v. *Nell*, 59 Utah, 68, 202 P. 7.

[2] *State* v. *Anselmo*, 46 Utah, 137, 148 P. 1071; *State* v. *Haworth*,
24 Utah, 398, 68 P. 155; *State* v. *Vacos*, 40 Utah, 169, 120 P. 497;
*State* v. *Riley*, 41 Utah, 225, 126 P. 294.

within discretion of court to refuse to order jury to be confined until case was finally ended.

8. CRIMINAL LAW—PERMITTING DECEASED'S WIFE TO TESTIFY TO ADMITTED FACT NOT ERROR. Permitting widow of deceased to testify over defendant's objection, for purpose of identifying a stolen watch, was not error, though defendant offered to admit identity of watch.[3]

9. CRIMINAL LAW—REQUESTED INSTRUCTION THAT EVERY ELEMENT OF CRIME MUST BE PROVED "CLEARLY AND CONCLUSIVELY" PROPERLY REFUSED AS MISLEADING. Defendant's requested instruction, that every element of crime must be "proved so clearly and so conclusively" that there was no reasonable theory on which defendant could be innocent, was properly refused, as having tendency to mislead jury and cause them to believe that something more was required than proof beyond reasonable doubt.

10. CRIMINAL LAW—REQUESTED INSTRUCTION COVERED BY GIVEN INSTRUCTIONS PROPERLY REFUSED. Where court's instructions accurately state measure of proof required, and accurately defined a reasonable doubt and covered the whole subject-matter of defendant's requested instruction in clear and unmistakable terms, it was unnecessary to give requested instruction.[4]

11. CRIMINAL LAW—CROSS-EXAMINATION SEEKING TO ELICIT SELF-SERVING STATEMENTS OF DEFENDANT, PROPERLY EXCLUDED. Cross-examination of state's witness as to a conversation with defendant designed to show that defendant then told witness the same story that he afterwards told at trial, thus attempt-

[3] *State* v. *Thorne*, 41 Utah, 414, 126 P. 287, Ann. Cas. 1915D, 90.
[4] *Reddon* v. *U. P. R. R. Co.*, 5 Utah, 344, 15 P. 262, affirmed 145 U. S. 657, 12 Sup. Ct. 989, 36 L. Ed. 848.

See Headnote 1.   35 C. J. p. 375.
Headnote 2.   35 C. J. p. 312.
Headnote 3.   35 C. J. p. 363.
Headnote 4.   17 C. J. p. 274.
Headnote 5.   17 C. J. p. 290.
Headnote 6.   16 C. J. p. 484.
Headnote 7.   16 C. J. pp. 1075, 1076.
Headnote 8.   16 C. J. p. 562.
Headnote 9.   16 C. J. pp. 991, 1036.
Headnote 10.   16 C. J. p. 1063.
Headnote 11.   16 C. J. p. 636.
Headnote 12.   16 C. J. p. 512.

ing to have each story corroborate the other, and strengthen defendant's testimony before the jury, *held* properly excluded, as purpose of testimony was apparently self-serving.

12. CRIMINAL LAW—COMMON KNOWLEDGE THAT ONE KILLING ANOTHER IN SELF-DEFENSE IN PRESENCE OF OTHERS NOT LIKELY TO CONCEAL BODY OF VICTIM, STEAL HIS PROPERTY, AND FLEE FROM STATE. It is common knowledge that a man who kills another in self-defense, in presence of his own companions who can testify in his behalf, is not likely to conceal body of his victim, rifle his pockets, steal his property, and flee from state. STRAUP, J., dissenting in part.

Appeal from District Court, Third District, Salt Lake County; *M. L. Ritchie*, Judge.

Ralph W. Seyboldt was convicted of murder in the first degree, and he appeals.

AFFIRMED, and cause remanded with directions.

*Clawson & Elsmore* and *Samuel G. Clawson*, all of Salt Lake City, for appellant.

*Harvey H. Cluff*, Atty. Gen., and *L. A. Miner*, Asst. Atty. Gen., for the State.

THURMAN, J.

The defendant was convicted of the crime of murder in the first degree, without recommendation, and sentenced to be executed as provided by law. He appeals from the judgment, and assigns numerous errors in support of his appeal.

It is not contended that the evidence is insufficient to sustain the verdict, nevertheless, before disposing of the questions of law involved, we deem it expedient to make a brief statement of the facts relied on by the state, together with the substance of defendant's testimony, as to how the transaction occurred.

On the 14th day of October, 1923, the dead body of David H. Crowther, a policeman of Salt Lake City, was found in the western portion of said city near the Jordan river. His death was caused by a gunshot wound in the back of the head—the bullet passing through the brain and emerging just above the forehead. The pockets of his trousers were turned inside out and no articles were left in any of his clothing. The body of the deceased was found in a section of the city assigned to him for duty—a section occupied largely by railroads and railroad stations, and, consequently, a logical rendezvous for tramps and hobos beating their way upon the incoming and outgoing trains. The deceased officer used an automobile in making his rounds in the performance of his duty. When the body was found the car was missing. A day or two after the finding of the body the defendant, with two other persons included in the information, was arrested in San Bernardino county, Cal., by officers of that state, and upon interrogation the defendant admitted killing the deceased and stealing the car in order to make his escape. The party also stole the officer's revolver and watch and sold them along the route, together with a spare tire and spotlight belonging to the car, and spent the proceeds in obtaining gasoline and other necessary supplies.

The defendant pleaded not guilty and was tried alone. His two companions afterwards pleaded guilty of murder in the second degree, and were sentenced to imprisonment in the state penitentiary.

The homicide occurred as alleged in the information on the 12th day of October, 1923, and the defense relied on by the defendant was the alleged fact that, on the afternoon of that day, he and his two companions, while in the vicinity of the railroad station, came in contact with the deceased, who was standing by his car apparently looking it over. Deceased motioned defendant to come down. At the suggestion of the deceased, defendant called his companions who also came. Defendant testified that both he and the deceased were intoxicated when they first met, and that

deceased drove him and his companions to a place where
defendant purchased more liquor which all of them drank.
It was also testified by defendant that, while they were rid-
ing around from one place to another, he sat by deceased
on the front seat; that his companions sat behind; that the
deceased put his arms around defendant and patted him on
the face and pinched his cheek; that defendant pushed him
away and treated it as a joke; that when they arrived near
the point where the homicide occurred the deceased again
repeated the offense; that he put his arm around defend-
ant's shoulder and pulled him over towards him and with
his left hand got hold of defendant's face; that defendant
pushed him away; that deceased put his arm around de-
fendant again and pulled him over; that defendant then
put his hand in deceased's face and pushed him away. The
deceased used some language not disclosed by the record.
He pulled out his gun and started to swing it around. As
he swung it around defendant reached over and knocked
deceased's gun out of his hand. The gun fell to the floor
of the car almost under the steering wheel. Deceased looked
at defendant a moment, cursed him, and said he would get
even with him, and started to reach for the gun but could
not reach it. He then straightened up. Defendant said,
"Don't touch that gun, if you do I am going to shoot you."
Deceased reached down to the floor for the gun. Defend-
ant told him not to touch it. Deceased cursed defendant and
said he would get him and get him right, and picked up the
gun and had it in his hand. As he was raising up defendant
fired the fatal shot. Finding that the deceased was dead,
the defendant and his companions removed the body from
the car and by partially lifting and partially dragging it
removed it to a point some distance away and deposited it
into or near a slough behind some bushes with the avowed
purpose of hiding it so it could not be immediately discov-
ered. Previous to removing the body, defendant took de-
ceased's revolver and laid it on the front seat of the car.

Such in brief is the substance of defendant's testimony
as to the incidents leading up to and immediately connected

with the tragedy. Defendant also admitted that they took the car to make their "get-away." The revolver and watch of deceased were also taken and disposed of with certain accessories of the car hereinbefore referred to.

The evidence on the part of the state consists largely of circumstances and alleged confessions by defendant from which the jury were warranted in finding that the homicide was an unprovoked and cold blooded murder for the sole purpose of obtaining the car in order to reach Los Angeles, for which city the party were bound. His statement to the sheriff of San Bernardino county, Cal., as testified to by that officer, was to the effect that he shot the deceased and killed him; that he was alone with the deceased in the car, and that they drove down to the bank of a small stream and that he started in to "stick up the officer," and that the officer went for the left-hand front pocket of the car, whereupon defendant shot him through the head and killed him; that he dragged the body from the car and robbed it, and then got into the car and drove back to where his companions were and picked them up. The sheriff further testified that defendant then told him concerning the disposition of the property taken from deceased and the places along the route where the articles were disposed of. The testimony of two or more of the witnesses was also to the effect that when asked why he killed the officer in order to get his car defendant said, "I must have lost my head." There are many details connected with the transaction not necessary to enumerate inasmuch as the sufficiency of the evidence to sustain the verdict is not challenged or in any manner in question. This brings us to a consideration of the questions of law involved.

The first error assigned is the refusal of the court to issue a new venire from which to select the jurors. The reasons assigned by defendant why a new venire should have been issued by the court is because 12 of the jurors, who were on the old venire had been in the Farr Case, in which the "evidence showed a flagrant disregard of life on the part of the accused." The jury in that case had brought in a ver-

dict of murder in the first degree, but with a recommenda-
tion for life imprisonment. In sentencing Farr, it is said by
counsel in their brief, ''the court took occasion to administer
a severe reprimand to the jurors who had shirked their duty,
by recommending a life sentence.''

The gist of counsel's contention is that such a jury, in
the face of such a reprimand, would not be inclined to make
a similar recommendation in a subsequent case, where the
evidence showed it to be a case of murder in the first degree,
notwithstanding mitigating circumstances might appear.

The question presented is unique. No authorities are cited
in support of the contention made. It was not a challenge
to the panel for the objection only went to a specified class
of jurors, and not to the entire panel. Besides this, the
objection was not based upon grounds necessary to constitute
a valid objection to the panel, as provided in Comp. Laws
1917, § 8940, but the objection rather went to the bias of
the jurors, which could only be reached by an examination
of each individual juror after he was called in the case.
In this connection it is pertinent to remark that we see no
reason why counsel could not have examined each juror at
any reasonable length upon the very matter which consti-
tutes the basis of their objection. It certainly would have
been proper to ask the juror if he sat in the Farr Case, and,
if he answered affirmatively, then ask him if he heard the
reprimand administered by the court, and whether
or not in the instant case, if accepted as a juror, he
would render a fair and impartial verdict in accord-
ance with his conscientious convictions, notwithstanding the
rebuke in the former case. The writer is of opinion that
such questions, or others with the same end in view, would
have been pertinent and proper, and that that was the
only way known to our practice by which the situation con-
fronting defendant could have been met and disposed of.
The court did not err in refusing to issue a new venire.

The next assignment charges error in the dismissal of the
Juror Kelso who was sworn upon his voir dire and exam-
ined by the court. The court of its own motion, after the

examination, dismissed the juror not only from the case, but for the term. As the question is one of practice and somewhat unusual we here present the entire examination of the juror, together with the order of the court:

"Q. Mr. Kelso, what is your occupation? A. Timekeeper for the Utah Light & Traction Co.

"Q. How long has that been your occupation? A. Four years.

"Q. Have you any conscientious scruples against the infliction of the death penalty? A. I have not.

"Q. You believe that it is morally right? A. I do.

"Q. Mr. Kelso, you have been interrogated on this question once before at this term, haven't you? A. Yes, sir.

"Q. And you made the same answers you did the first time to the question asked by counsel. I don't think the last question that has been put, about moral right, was asked you but you said in substance, did you not, that you believed that you had no conscientious scruples and no hesitancy about the death penalty in a proper case? A. No, sir.

"Q. Will you kindly tell me what you consider a proper case, what your idea is; I would like to know? A. Well, where he is proven guilty beyond a reasonable doubt that the murder was premeditated and deliberate, and it was proven that he was guilty, in that way.

"Q. If you were impaneled as a juror in a homicide case where murder in the first degree was a charge, would you go into the jury box and make any such statement as that you didn't want to have on your soul or conscience the death of a defendant following you through life; would you make any such statement as that? A. I would not.

"Q. Would you be influenced by any such an argument as that? A. I would not.

"The Court: You may be excused; and I think you may be excused for the term, Mr. Kelso, inasmuch as there is nothing but homicide cases to try, the court has to be the judge of what the weight and value of the statements of a juror may be."

From the examination it will appear that the court dismissed the juror without any apparent cause. His answers were fair, pertinent, and to the point, and showed him to be qualified to serve in a capital case, and, for aught that appears, in the case at bar.

Counsel for defendant strenuously insist that the dismissal of the juror was prejudicial error, and in support of their contention make reference to 24 Cyc. 260, in which the power

of the court to excuse jurors on its own motion is discussed at considerable length. A more pertinent reference, however, is found on page 315 of the same volume in which the author says:

"It has been held to be reversible error for the court of its own motion and against the direct objection of one of the parties to exclude a juror without good cause, or for a cause which merely affords a ground of challenge which the parties may waive, and which if waived would not affect the juror's competency; but, on the contrary, it has been held that it is not reversible error to exclude a juror for an insufficient cause if an impartial and unobjectionable jury is afterward obtained, particularly where the excepting party has not exhausted the peremptory challenges to which he is entitled."

The author cites the following cases: *Welch* v. *Tribune Pub. Co.*, 83 Mich. 661, 47 N. W. 562, 11 L. R. A. 233, 21 Am. St. Rep. 629; *Montague* v. *Comm.*, 10 Grat. (Va.) 767; *Bell* v. *State*, 115 Ala. 25, 22 So. 526; *Van Blaricum* v. *People*, 16 Ill. 364, 63 Am. Dec. 316; *Greer* v. *State*, 14 Tex. App. 179.

The case most strongly supporting appellant's contention in the foregoing list is *Van Blaricum* v. *People*, supra, in which the court of its own motion dismissed a juror who stated he had formed and expressed an opinion in the case. In the course of the opinion the court said:

"It does not appear but that the juror possessed the legal qualifications required by the statute, but that he was subject to challenge for favor. If the parties chose to have their cause tried by a prejudiced juror, it was not for the court to refuse them the right. I once heard a trial for murder, where a majority of the jury stated that they had formed and expressed the opinion that the prisoner was guilty, and still he accepted and was tried by them, and was acquitted upon a technical point, which his counsel evidently supposed those jurors had the capacity fully to comprehend, and the firmness and integrity to give him the benefit of. So in this case, the prisoner had a right to be tried by this juror, unless the people should challenge him. Whether he would have been challenged by the people, had he not been set aside by the court, we cannot know. It is enough that he might have been accepted by them, to give the prisoner the benefit of the exception. That chance, at least, was his right, and because he was deprived of it, he must have a new trial."

In *Bell* v. *State,* supra, it was held error for the court, on its own motion, to dismiss a juror because it appeared that he had been summoned as a witness for one of the parties, such fact being merely a cause for challenge by one of the parties, which might be waived.

In *Montague* v. *Comm.,* supra, the fifth headnote reflects the opinion of the court reversing the judgment:

"The court cannot, of its own motion, where no challenge is made, without good cause, set aside a juror, except where he is disabled physically or mentally from properly performing the duties of a juror, or is disqualified by statute."

In *Welch* v. *Tribune Pub. Co.,* supra, at page 666, 47 N. W. 564, of the report, it is said:

"The court, without a challenge being interposed, and without stating any cause or reason therefor, excused the juror, against the protest of the plaintiff. We do not think the judge has a right to reject a qualified juror with whom the parties are satisfied, unless for sufficient cause; and such cause should appear upon the record. *Pearse* v. *Rogers,* 2 Fost. & F. 137. The circuit judge is not invested with any right of peremptory challenge. He can excuse for cause, but the cause must be stated, so that it may appear of record. Proff. Jury, § 140. The exercise of the power to discharge à juror by the circuit judge of his own volition is not a matter of discretion. It must be based upon some cause. It will not do to hold that a circuit judge may, without assigning any reason, discharge jurors at his mere will or caprice. If he may so discharge one juror he may discharge a dozen, and compel parties, after they have exhausted their peremptory challenges, to accept such a jury as he is satisfied with."

In *Greer* v. *State,* supra, a full jury had been impaneled and accepted by the parties. The court upon its own motion ordered four of the jurors to stand aside. It was held that the action of the court was without authority and erroneous.

We have carefully examined numerous other cases to the same effect as those above cited, and many others in which the trial courts dismissed jurors without challenge by one or the other of the parties, and the orders of dismissal sustained, but we have found no case whatever in which such orders were sustained, unless some reason for making the orders appeared upon the record. The trial court undoubtedly has the power, of his own motion, to dismiss a juror

lacking the statutory qualifications; and in a capital case there can be no doubt of the power of the court to stand a juror aside for conscientious scruples against the infliction of capital punishment, for in such cases the statute expressly declares the juror may not be permitted to serve. But in the case at bar, as before stated, the examination of the juror on his voir dire disclosed no reason whatever for his peremptory dismissal, nor was there any challenge interposed.

While it must be conceded that it is elementary law that the trial judge has a wide discretion in determining the qualification of a juror when examined as to his bias, yet it is not an arbitrary discretion. As stated in 2 Thompson & Merriam on Jurors, at page 278, in speaking of the power of the court to dismiss jurors of its own motion:

"There can be no doubt that there is need of caution by the trial judge in the exercise of this discretion in discharging jurors."

In the light of the authorities we have examined, the court is of opinion it was error to dismiss the Juror Kelso, in view of the examination made by the court and the answers of the juror appearing upon the record. But whether or not such error was prejudicial is another and different question.

It has often been held by this court that in this jurisdiction prejudice is not presumed from error. (See one of the latest cases, *State* v. *Nell*, 59 Utah, 68, 202 P. 7.) The statutes of the state (Comp. Laws 1917, § 9231), expressly declare that this court in criminal cases on appeal must give judgment without regard to errors which have not resulted in a miscarriage of justice. It is further provided that, if error has been committed, it shall not be presumed to have resulted in a miscarriage of justice, and that the court must be satisfied that it has before it is warranted in reversing the judgment. The statute is revolutionary in its effect in that it entirely abrogates the old rule under which if error was found prejudice was presumed. It has now become the duty of this court in criminal cases,

on appeal, to go further than the mere finding of error. It must be satisfied that the error is prejudicial before it is warranted in reversing the judgment.

The examination of the Juror Kelso discloses nothing from which it can be determined that the defendant would be prejudiced by requiring the juror to stand aside. There was nothing disclosing a sympathetic tendency or the slightest favoritism for either party. In view of the record the court is not satisfied that the dismissal of the juror resulted in a miscarriage of justice, notwithstanding such dismissal was erroneous as matter of law.

Defendant also assigns as error the ruling of the court in denying his motion for a continuance upon application made March 24, 1924. The application was based upon the affidavit of Samuel G. Clawson and three other persons. The affidavit of Clawson recites numerous murders and murder trials recently occurring in Salt Lake City in which policemen of the city were victims, together with criticism of the board of pardons on account of alleged leniency. In consequence of all of which affiant asserts that the public mind had become inflamed to a degree that it would be impossible to accord defendant a fair trial on the date set by the court. The affidavits of the other three persons were to the same effect as to the inflamed state of the public mind. All of the affidavits asserted that there appeared to be strong public prejudice against the defendant. Counter affidavits were filed on behalf of the state by 14 persons, who expressed the opinion that there was far less prejudice against the defendant than had been manifest in any recent homicide case, and were of opinion that the defendant would have a fair trial, as far as sentiment of the community was concerned. The court, in the exercise of his discretion denied the motion.

An information was filed in the case November 24, 1923, and on the same day defendant was arraigned and pleaded not guilty. On January 5, 1924, the case was set for trial January 12, and later continued to February 2, and later still, on request of the district attorney, the case was continued till March 17. During this period of time counsel

for defendant were endeavoring to get continuances on the grounds that they were not prepared to go to trial owing to the brief time they had had for preparation, but no suggestion was made as to the inflamed condition of the public mind, or prejudice against the defendant. The affidavits of defendant in support of his motion appear to have been fairly answered by the numerous affidavits filed on behalf of the state. In such case the discretion of the trial court in denying a continuance will not be reviewed. *State* v. *Anselmo,* 46 Utah, 137, 148 P. 1071; *State* v. *Haworth,* 24 Utah, 398, 68 P. 155; *State* v. *Vacos,* 40 Utah, 169, 120 P. 497; *State* v. *Riley,* 41 Utah, 225, 126 P. 294. Even if there should be more or less excitement in a community on account of numerous recent murders such would hardly be grounds for a continuance if a fair and impartial jury could, notwithstanding, be obtained. The granting of continuances on that account would certainly not have a restraining influence against the further commission of crime. A fair, speedy, and impartial trial is what the defendant has a right to demand, and, on the other hand, it is the duty of the prosecuting officers of the state to demand it for the protection of society and the peace-loving people of the commonwealth. There was no error in denying the continuance.

At the close of the first day of the trial, counsel for defendant requested the court to order that the jury be confined and kept in charge of the bailiffs till, the case was finally ended. No special reasons were given or representations made. The request was denied. This ruling of the court is assigned as error.

It appears affirmatively from the record that the court at each recess and adjournment occurring during the trial gave the jury the statutory admonition against conversing with other persons or among themselves about the case until it was finally submitted. There is nothing to indicate that the admonition was not strictly observed or that the jurors even mingled with the people of the community or were even

in conversation with other persons during the trial of the case.    Comp. Laws Utah 1917, § 9001, provides:

"The jurors sworn to try a criminal action may, at any time before the submission of the case to the jury, in the discretion of the court, be permitted to separate or be kept in charge of a proper officer. The officer must be sworn to keep the jurors together until the next meeting of the court, to suffer no person to speak to them or communicate with them, nor to do so himself, on any subject connected with the trial, and to return them into court at the next meeting thereof."

While it is not unusual and is oftentimes prudent, especially in capital cases, for the trial court to order that the jury be kept together in charge of an officer during the trial and until the case is submitted, nevertheless, as appears from the statute quoted, it is a matter entirely within the discretion of the court. Counsel, in support of their request, refer to the following authorities which appear to lend support to their contention. 16 R. C. L. 312; *Armstrong* v. *State,* 102 Ark. 356, 144 S. W. 195; *Sargent* v. *State,* 11 Ohio, 472; *Hamilton* v. *State,* 62 Ark. 543, 36 S. W. 1054. Whatever may be the statutes of the states controlling in the cases cited, or the circumstances involved in such cases, they can have neither binding effect nor persuasive influence upon this court in view of our own statute hereinbefore referred to. Even if we could hold that it was error to allow the jury to separate, which would be going too far in view of the statute last quoted, we would still be confronted with the other statute to which reference has been made which declares that prejudice may not be presumed, notwithstanding error may have been committed.

The widow of deceased was permitted to testify over defendant's objection. The ruling of the court is assigned as error. It appears that all she was called for was to identify the stolen watch. The defendant offered to admit its identity and objected to her testifying in the case. The district attorney insisted upon her being allowed to testify and the court permitted it. Counsel, among other things, say in their brief:

"The only reason she was called to the stand for was to work

upon the passion of the jurors, to deepen their prejudice, for what man/listens to a widow sobbing out her sorrow without a resolve to punish the hand which caused the trouble."

In support of this assignment counsel call our attention to the following authorities. 38 Cyc. 1416; *Green, Adm'x, v. Ashland Water Co.,* 101 Wis. 258, 77 N. W. 722, 43 L. R. A. 117, 70 Am. St. Rep. 911; *Woodbridge Ice Co.* v. *Semon, etc.,* 81 Conn. 479, 71 A. 577. We cite the cases without comment, as we do not deem the question of sufficient importance to justify the effort. The cases are clearly distinguishable from the case at bar. This court has heretofore passed upon a similar question. In *State* v. *Thorne,* 41 Utah, 414, 126 P. 287, Ann. Cas. 1915D, 90, cited by the Attorney General, appellant charged as error a ruling of the court permitting the mother of deceased to testify in the case notwithstanding her testimony was subsequently stricken as immaterial. The court in the course of its opinion, at page 430 of the Utah Report, 126 P. 292, speaking through Mr. Chief Justice Frick, said:

"The objection and complaint of counsel is, however, not directed so much to what the witness testified to, as it is to the fact that the prosecuting attorney called her as a witness in the case. It is contended that the prosecuting attorney was unfair, and was guilty of bad faith in calling the witness at all, and that he did so for the sole purpose of arousing the prejudices of the jurors against the appellant. So far as the record shows, we are unable to see why the mother of the deceased should have aroused the prejudices of the jurors against appellant. Her testimony certainly could not have had such an effect. What her acts and conduct were is not disclosed. The witness, however, had a perfect right to come into court and witness the proceedings; and, if her mere presence in court, in case her conduct was proper, enlisted the sympathy of the jurors in her behalf or aroused their prejudices against appellant, the court was powerless to prevent such a result. If men, young or old, will enter upon a life of crime, and in their mad career will resort to robbery and murder, they must submit to an open and public trial at which anyone may be present. The relatives and friends of the one who may have been robbed or murdered have just as much right to be present at such trials as anyone else, and they may also be called as witnesses, and testify to any material matter of fact; and the mere fact that such a relative may be called, whose testimony, after it has been

elicited, is by the court found to be immaterial and stricken out, affords no grounds for a new trial."

The introduction of evidence concerning a fact which the opposing party is willing to admit is oftentimes subject to the criticism that it was introduced for an ulterior purpose.   Unless such evidence is pertinent to emphasize a fact which the admission does not fully cover it is safer far, especially in a case of this kind, to accept the admission rather than to give the accused a pretext to complain of misconduct or unfairness.   However, as held in the *Thorne Case,* supra, it was not error to admit the evidence.

The next matter complained of by defendant was the refusal of the court to grant defendant's ninth request.   The request was given in part and in part refused.   We here quote the request in its entirety, italicizing for convenience the part rejected :

"You are instructed that mere probabilities are not sufficient to warrant a conviction in a criminal case, nor is it sufficient that the greater weight, or preponderance of the evidence, support the allegations of the information, nor is it sufficient upon the doctrine of chance that it is more probable than otherwise, that the defendant is guilty as charged in the information. *I charge you that to warrant the conviction, every element of the crime charged in the information must be proved to you so clearly and so conclusively that there is no reasonable theory upon which the defendant can be innocent. When the evidence in the case is considered together, and when you so consider the evidence, if there remains in your mind a reasonable doubt as to the defendant's guilt, from any element necessary to constitute the crime and hereinbefore defined to you, then I charge you the defendant is entitled to a verdict of not guilty.*"

The part rejected is stated in stronger language than is ordinarily given by courts in criminal cases.   The words "proved to you so clearly and conclusively" might have a tendency to mislead the jury and cause them to believe that something more was required of the state than mere proof beyond a reasonable doubt.   I am of the opinion that the request in this regard was objectionable.   In any event the part of the request given by the

court, together with instruction No. 8, clearly and accurately stated the measure of proof required. These, together with instruction No. 10 which accurately defined a reasonable doubt, covered the whole subject-matter of defendant's request in clear and unmistakable terms. In such case it was unnecessary to give the instruction as requested by defendant. *Reddon* v. *U. P. R. R. Co.*, 5 Utah, 344, 15 P. 262, affirmed Id., 145 U. S. 657, 12 S. Ct. 989, 36 L. Ed. 848. The refusal of the request was not error.

Finally, it is urged by the defendant that the court erred in restricting his cross-examination of the witness Beckstead, a witness for the state.

The witness testified on his direct examination that he was chief detective of Salt Lake City; that he first saw the defendant on Monday the 22d of October, 1923, and had but little conversation with him at that time; that he saw him again the next day; that on one or the other of those days defendant gave his age as 20 years; that he had no conversation on either of those days about the killing of Crowther, but on Wednesday he had another conversation in which the subject of the homicide was discussed. On that day the witness showed defendant his record in the Wyoming penitentiary in which his age was given as 25 when he entered the prison. Defendant, however, denied that that was his age, but finally admitted he was born in 1900. Witness testified defendant told him he was in the car when the homicide occurred; that they drove the car along the river and the car stopped for a few minutes and the deceased said something about moving on and leaned over sligtly apparently going to turn over the ignition when a shot rang out. Witness asked defendant who fired the shot and he said he did not know. Witness asked defendant if he helped to take the body from the car and he said he did and described the method in which the body was removed over to the point where it was concealed. Witness asked defendant if he was willing to go to the place where the body was found and demonstrate what occurred there and he said he was, and they went out there and defendant

showed where the two men sat in the back of the car while he sat in front by the driver. Defendant then showed how they removed the body and the point to which it was taken. It was near the roadway leading down from North Temple to South Temple street. Defendant pointed out a slough where the body was hidden, probably 15 feet west of the river. They then went back to the police station. Witness asked defendant where he obtained the gun with which deceased was killed. He said he stole it in Wyoming from a man named Blackie. He said he had been in the Wyoming penitentiary about two years or a trifle over. Such in substance was the testimony of Beckstead in chief.

On cross-examination, witness stated that at no time did defendant say he had killed the officer. Witness said he and defendant went over the route pointed out by defendant. Witness was then asked: "Where was it Mr. Seyboldt pointed out that he met Officer Crowther?" This was objected to by the prosecution as not proper cross-examination and as being immaterial and irrelevant. The objection was sustained on the ground that it was not proper cross-examination. Exception was noted.

Later on defendant's counsel asked: "Will you tell the jury just the route, that you did take from the police station to the place where the officer's body was found?" This was objected to by the prosecution as being irrelevant, immaterial, and not proper cross-examination. Objection sustained on the latter ground. Exception. Further on in the cross-examination counsel asked the witness: "Did you have a conversation with the defendant Seyboldt on this afternoon of this day that you went from the police station to the point where the officer's body was found?" This was objected to by the prosecution as "not proper cross-examination, because there has been no conversation introduced in chief with reference to this trip." Objection sustained on the ground stated. Defendant's counsel explained that the purpose of the question was to bring out the full facts of the transaction which the state had opened

up by the testimony introduced, and also for the purpose of testing the credibility of the witness.

We have stated these proceedings with more detail perhaps than is necessary to illustrate the point of defendant's objection. We have done so for the sole purpose of illustrating the fact that the cross-examination was unduly restricted, and, were it not for the fact that the questions to which objections were sustained appear to be of no substantial materiality, error would have been committed in sustaining the objections. The objections were sustained as not being proper cross-examination, when, if sustained at all, it should have been on the grounds that the questions did not appear to be material. For instance, the witness had testified in chief that defendant went with him to point out the place in question, yet, when defendant's counsel, on cross-examination, asked the witness, "where was it Mr. Seyboldt pointed out that he met Officer Crowther" the question was objected to as immaterial, irrelevant, and not proper cross-examination, and the objection was sustained on the latter ground. Again, when defendant's counsel asked the witness to tell the jury what route he took in going from the police station to the point where the officer's body was found the objection was made that it was immaterial, irrelevant, and not proper cross-examination, and sustained on the latter ground. The foregoing examples are typical of numerous others appearing in the record which we have neither time nor inclination to set forth. If the examination of the witness, in chief, upon these questions was material a reasonable cross-examination on such matters should have been permitted. We suggest, as a matter of caution, that loose methods in the conduct and trial of criminal cases, especially in cases where human life is at stake, are dangerous experiments and indefensible. They should never be practiced by the prosecuting officer nor permitted by the court.

The point, however, in question here is, Did the court err in sustaining the state's objection to the question propounded by defendant? The question was, "Did you have

a conversation with the defendant Seyboldt on this afternoon of this day that you went from the police station to. the point where the officer's body was found?'' The objection was that it was ''not proper cross-examination as there had been no conversation introduced in chief with reference to this trip.'' The objection seems to have been premature. The witness, if permitted, might have answered ''no.'' But the matter has been treated by both the state and defendant as if the question was ''what conversation, if any, did you have with defendant on the trip?'' It does not appear that the question called for anything material. There might have been a conversation or many conversations, wholly immaterial to the controversy before the court. Counsel stated to the court the purpose of the question was to bring out all the facts of the transaction which the state had opened up and also to test the credibility of the witness. If counsel meant, as their language implies, to bring out all the facts opened up by the state during the trial of the case, the purpose was entirely too broad, for the testimony of the witness in chief as to what occurred on the trip was restricted to having the defendant point out certain places descriptive of what was done in connection with the crime. The record does not disclose anything that could be termed a conversation in which Beckstead participated while on the trip. From defendant's brief, it appears that the principal reason counsel gives for contending that the question was proper was that the conversation might show that defendant then told the witness the same story that he afterwards told at the trial. In other words, his story told at one time would corroborate his story told at another, and thus strengthen his testimony before the jury. We know of no rule which permits the admission of evidence for such a purpose either on direct or on cross-examination, except in exceptional cases of which this is not one. For that purpose the testimony sought to be elicited has all the ear-marks of a self-serving purpose and was therefore inadmissible. The court is of opinion there was no error in sustaining the objection.

Our conclusions in this case involve serious consequences to the defendant the gravity of which has impelled us to the exercise of more than ordinary care in examining the record of the trial. It discloses the fact that the defendant was only 23 years of age when he committed the awful crime for which he was convicted and sentenced. Prior to coming to Utah with his companions in October, 1923, he served two years or over in the Wyoming penitentiary on a charge of grand larceny and shortly after being released stole the revolver with which he afterwards killed the deceased. On arriving in Salt Lake City before the commission of the homicide in question, he and his companions staged a "holdup" within the limits of the city and attempted to rob an unoffending citizen. His testimony on the witness stand as to why he killed the deceased was not believed by the jury, and was wholly unbelievable. Not satisfied with killing the deceased for the evident purpose of obtaining possession of his automobile and other property he sought to besmirch his character by insinuating that deceased contemplated an indecent assault upon defendant and, when defendant resented it, that deceased became furious, reached for and obtained his gun, and for this reason defendant fired the fatal shot. The deceased's version of the transaction can never be known, but enough is known to establish the fact that the insinuation against his character was a foul and malignant slander. The neighbors and associates of deceased who had known him practically all his life went on the stand and testified to his general reputation for morality and declared it was good. This testimony was not contradicted by a single witness. Such testimony however, was wholly unnecessary as the fact that defendant and his two companions, all young able-bodied men, were present together is itself a refutation of the idea that the deceased contemplated an immoral act. The pretense of defendant that he shot deceased in self-defense is likewise indefensible for the same reason. Besides this, it may be stated as a matter of common knowledge that a man who kills his fellow man in self-defense in the presence of his own friends and com-

panions who can testify in his behalf is not likely to conceal the body of his victim, rifle his pockets, steal his property, and flee from the state as defendant admits he did in the instant case.

There is no reversible error in the record and no merit whatever in the defense relied on at the trial.

The judgment is affirmed, and the cause remanded with directions to the trial court to fix the date for execution.

GIDEON, FRICK, and CHERRY, JJ., concur.

STRAUP, J.    I concur in the result affirming the judgment.    I also concur in the holding that error was committed in excusing Juror Kelso.    I also think error was committed in restricting the cross-examination of witness Beckstead, not that the defendant was entitled to take answers to all the questions propounded, but to those which related to the transactions and conversations testified to by the witness on his direct examination.    Questions which called for mere self-serving statements, of course, were not competent, unless they were connected with or related to the dis-serving statements of the defendant and as testified to by the witness, or otherwise were part of the transactions or conversations testified to by him.    I think some of the questions propounded called for testimony which had such tendency.

However, I do not think the errors of such prejudicial effect as to justify a reversal of the judgment.    But I do not concur in the statement that "prejudice is not presumed from error."    That is putting the proposition too broadly. The rule, notwithstanding section 9231, Comp. Laws Utah 1917, is that while prejudice will not be presumed from mere error, still a committed error or an erroneous ruling, which is calculated, or has the tendency, or the natural effect, to do harm and to affect a substantial right, will be presumed to have done so, until on the record it is shown that no such harm was or could have been done. *State* v. *Cluff*, 48 Utah, 102, 158 P. 701.    The denial of a litigant's right to

proper cross-examination may affect a substantial right. Whether in a particular matter the denial was calculated to do harm is dependent upon a variety of things, chiefly the character of the matter sought or elicited and its bearing upon or relation to other evidence. Whether the presumption is overthrown by the record is again dependent upon a variety of things, the issues, the quantum, and character of other evidence, and the natural and probable effects of the ruling when considered with the whole of the evidence. When so considered, I do not think the ruling was of such harmful effect as to work a reversal of the judgment. Because of the undisputed evidence in the case and the admissions of the defendant as to the committed offense, I feel satisfied the same result would have been reached by the jury had the erroneous rulings not been made.