272 P.2d 195

## STATE v. PENDERVILLE.

No. 8053.

Supreme Court of Utah.

July 1, 1954.

R. Verne McCullough, Leland S. McCullough, Salt Lake City, for appellant.

E. R. Callister, Jr., Atty. Gen., Walter L. Budge, Asst. Atty. Gen., for respondent.

KELLER, District Judge.

By a verdict returned in the District Court of Salt Lake County, State of Utah, December 19, 1952, Edgar Ronald Penderville, the appellant, was convicted of murder in the second degree for the slaying of June Weiler Penderville on July 30, 1952. He claims prejudicial error in the proceedings against him:

1. Because the trial court denied the following motions:

a. A motion to dismiss made at the close of the state's case and renewed at the end of the appellant's case;

b. A motion to dismiss the charge of first degree murder made at the close of the state's case and renewed at the close of appellant's case;

c. A motion to reduce the charge to voluntary manslaughter made at the close of the state's case;

d. A motion for a new trial based upon the ground that the verdict was contrary to the law and the evidence.

2. That the trial court erred in refusing to allow the witness William J. Christensen to testify to conversations had with the appellant.

3. Because of the refusal of the trial court to postpone the date of the trial to enable the appellant to procure other counsel, and the court's refusal to permit appellant to conduct his own defense.

On July 30, 1952, and for approximately a month prior thereto, the appellant and deceased were tenants in an apartment at what is known as Barbara Place in Salt Lake City. At about 9 o'clock in the evening of said day, one William .J. Christensen, an attorney, in response to a telephone call made shortly before by appellant came · to the apartment.. Concerning what he observed on that occasion, Mr. Christensen testified that the deceased was lying on the . floor; that with the exception of her face she was covered with a chenille bedspread; that there was an ice pack on.her eyes and head; that she was breathing heavily; that at about forty-five minutes after his arrival she quit breathing and that he, at the request of the appellant, telephoned for Dr. Lyman W. Condie. He described the appellant as not appearing upset, alarmed or fearful, and that he appeared perfectly rational.

Dr. Condie arrived at the apartment at approximately 9:55 p. m. He had been .

there previously on the same day in the period between 5:15 p. m. and 6:00 p. m. and prior to that on July 27, 1952. He testified that on his visit of July 27th the appellant discussed various contusions on the person of the deceased and that the deceased said appellant had hit her; that the appellant denied it and said, "Oh, you were drunk and were stumbling around the room." Concerning what he observed on the person of the deceased on the occasion of this first visit on July 30th, he described her as having old contusions about the face and black eyes, and that such injuries appeared to have been of old origin. He testified that on the occasion of this visit deceased was under the influence of intoxicants and that he gave her three one and a half grain seconal capsules to alleviate her emotional anxiety and induce sleep. On Dr. Condie's last visit of July 30th he found the deceased on the floor dead. On this occasion he observed dark purple contusions about her eyes, considerably larger than those he had seen on his first visit of that day, and that there was blood in her nostrils and mouth. He gave it as his opinion that the injuries he observed were not self inflicted.

Dr. Adolph M. Nielson, Salt Lake City physician, made an examination of the deceased at the Penderville apartment at approximately 11:00 p. m. on July 30th. Describing what he observed in this examination, he stated: "All over her body were bruises, scratches and abrasions. Both her eyes were blackened and the tissues around the eyes were markedly swollen. There was blood in her nostrils and in her mouth. * * * Her nose was broken." On the following day he performed an autopsy on the body of the deceased. The following are quotes from his testimony regarding what the autopsy revealed: "There were several rather large bruises on the scalp. * * * The whites of the eyes were discolored and one might describe them as being bloodshot. * * * There was a dark purplish discoloration behind the ear drums which is ordinarily interpreted as being blood in that region. * * * There were several linear abrasions on the neck, all of which were on the same level and seemed almost to connect with one another. The tissues at the sides of these abrasions were depressed slightly. * * * The scalp was considerably thickened in areas and I would judge those contusions to be of fairly recent origin since there was considerable swelling in the tissues in and around them. * * * We made incisions into the dura which is one of the coverings of the brain and blood escaped from those incisions under considerable pressure. * * * It simply indicates that there was blood in the chamber where normally there is no blood and indicates, in other words that there had been hemorrhage into that region. * * * I thought the blood was there as a result of the trauma or injury to the head. * * * It is my opinion that she died from a subdural hemorrhage. * * * That resulted from external violence or trauma to the head. * * * I don't think they could

have been self inflicted." Dr. Nielson further testified that in the autopsy he made an examination of the lungs, heart, blood vessels, stomach and liver and found no abnormal conditions in these organs to which death of the deceased could be attributed.

Susan Eliason, a 14 year old girl, testified that she lived with her parents in an apartment at Barbara Place directly above that of the deceased on the day deceased came to her death; that in the period beginning at about 7 p. m. and lasting until about 7:25 p. m. of said day she was in the bedroom and bathroom of her apartment getting dressed in preparation for leaving; that throughout this period she heard sounds coming from the apartment below which she described as follows: "It sounded like it was stamping, a lot of racket and beating on the wall and things like that. It sounded like something was thumping on the floor and against the wall. It made me mad so I stamped on the floor to quiet it. It kept going on and was going on when I left." She was certain of the time because she looked at the clock at about the moment she left.

One G. J. Murray, caretaker of the Barbara Apartments, testified: That beginning about two or three days after the appellant and deceased occupied the apartment at Barbara Place, he heard appellant's voice constantly coming from his apartment, what he termed "constantly," and "always" in a demanding tone, and gave an uncouth and coarse statement that he recalled having heard the appellant make. Although this testimony may not be classed as of great significance, unexplained it may support a fair inference that the attitude of the appellant toward deceased was in some degree harsh and inconsiderate.

This witness further testified that the appellant drove a 1947 Cadillac; that this car on the 30th day of July was parked near the apartment; that during the daytime he did not see the appellant; that at about 5:00 in the evening he saw appellant using the office phone; that he saw him use the office phone at about 5:30, at about 6:30, and again at about 7:30. He fixed the time of this last telephone conversation by stating that it occurred while he was viewing the Blue Ribbon Bouts on television and that this program began at 7:00 o'clock.

Delbert F. Duncombe, a police officer, testified to having gone immediately to the apartment after receiving a telephone call at 10:09 on the evening of the 30th; that upon his arrival he observed within the apartment what appeared to be blood spots on a door jamb and casing, blood spatters on a chair and on the wall on the north end of the living room and a wet blood spot on the carpet. He further testified that on the following day he took from appellant trousers that he was wearing when he saw him at the apartment on the evening of July 30th, and that these had some spots on them that appeared to be blood.

286

■ In the foregoing paragraphs we have set forth in some detail the evidence of the state that was before the trial court when he denied the various motions listed above as a, b, c, and d. It has been repeatedly held by this court that upon a motion to dismiss or to direct a verdict of not guilty for lack of evidence that the trial court does not consider the weight of the evidence or credibility of the witnesses, but determines the naked legal proposition of law, whether there is any substantial evidence of the guilt of the accused, and all reasonable inferences are to be taken in favor of the state. State v. Lewellyn, 71 Utah 331, 266 P. 261; State v. Thatcher, 108 Utah 63, 157 P.2d 258; State v. Aures, 102 Utah 113, 127 P.2d 872; State v. Peterson, Utah, 240 P.2d 504. As is pointed out in one or more of these cases, the trial court has a discretion in the case of a motion for a new trial that it does not have in case of a motion to dismiss or to direct a verdict of not guilty. Nevertheless, in either case if there is before the court evidence upon which reasonable men might differ as to whether the defendant is or is not guilty, he may deny the motion.

From the evidence as set forth in the foregoing paragraphs, one may reasonably draw the inference that the injuries to the deceased were not self inflicted; that the person inflicting them acted with the intent to take the life of the deceased or to inflict injury knowing that the probable consequence thereof would be the infliction of great bodily injury or death; that the deceased died as a result of such injuries, and that such injuries were administered by the appellant.

■ The defendant offered himself as a witness. He testified that he left the apartment shortly after the departure of Dr. Condie at about 6:00 p. m.; that while away he ate his evening meal at a restaurant and purchased a fifth of liquor at a State Liquor Store; that when he left the apartment his wife was lying on the bed; that upon his return she was lying on the floor; that he observed some injuries to her eye and that her nose was bleeding; that he placed an ice pack over the eye but was not alarmed at her condition and denied having inflicted any of the injuries described in the testimony of the State. In his further defense the appellant offered the testimony of doctors by which he sought to establish that the deceased died from causes other than trauma at the hands of persons other than herself. Without giving this testimony in detail, we make the observation that it was not of such convincing force as to wholly destroy the inference of guilt that might reasonably be drawn from the testimony of the state. The trial court did not err in denying the motions a, b, c, and d.

■■ Did the trial court err in refusing to allow the witness William J. Christensen to testify as to conversation had with the appellant at the time of the death of the deceased? It is contended that these con-

versations should have been admitted as part of the res gestae. In order for the statements of the appellant made to the witness Christensen to be admissible, required the laying of a foundation from which it might be inferred that the statements of the appellant were made without reflection, were spontaneous and instinctive and were related to or connected with the main or principal event or transaction under investigation. Jackson v. Utah Rapid Transit Co., 77 Utah 21, 290 P. 970; State v. Seyboldt, 65 Utah 204, 236 P. 225. The appellant himself testified that he was not alarmed at the condition of his wife as she lay on the floor with the injuries that he had observed. He was described by the witness Christensen as being calm, not fearful, and as he stated, "perfectly rational." This mental and emotional state of the appellant was just the opposite of that from which one might infer that he acted or spoke with spontaniety or under excitement. No proper foundation is laid for the admission of any statements of the appellant made to the witness Christensen and the court did not err in excluding such statements.

On December 2, 1952, the trial court set the case for trial December 17, 1952. On the day before the trial was to commence the trial court received a letter from appellant complaining about the service being rendered by his attorney and requesting a postponement of the trial to enable him to procure other counsel. Immediately after receipt of the letter the trial court had the appellant brought before him to discuss appellant's request. A transcription of shorthand notes of the conversation had between the trial court and appellant constitutes a part of the record. This record does not reveal a showing on the part of the appellant to the effect that his attorney had been unfaithful or incompetent in preparing appellant's case, nor does it show that appellant or his attorney were not ready for trial. The court did not err in denying appellant's application for a postponement. A fair construction of the conversation between appellant and the court following the court's refusal to grant a postponement compels the conclusion that the appellant elected to defend in person rather than proceed with counsel that he had discharged or was about to discharge; that he made this choice notwithstanding what amounts to a warning by the court that his defense would probably be better made by counsel; and that the court, notwithstanding such election, appointed the same attorney who had been discharged or was about to be discharged to conduct appellant's defense at the trial. Did the court err in refusing to permit appellant to conduct his own defense? This question cannot be answered by reaching a conclusion that appellant was better defended by counsel than he would have been without the aid of counsel. The Constitution of this State provides: "In criminal prosecutions the accused shall have the right to appear and defend in person

and by counsel" Const. art. 1, § 12. Courts of last resort in several states have construed similar constitutional provisions in their application to facts quite similar to those in the instant case. 17 A.L.R. 266, and cases there cited. It is generally, if not universally held that the accused in a criminal proceeding who is sui juris and not mentally incompetent has the right to conduct his own defense without the aid of counsel. An accused may not, however, having once elected to proceed with the aid of counsel for purposes of delay or to obstruct the proceeding against him advance successfully an insincere claim of his right to defend in person. United States v. Gutterman, 147 F.2d 540, 157 A.L.R. 1221; United States v. Mitchell, 2 Cir., 137 F.2d 1006.

▇ It is clear that in this case the appellant sought a postponement in order to procure other counsel. The trial court was of the opinion that the application was a maneuver made in bad faith merely to procure delay of the trial. Regardless of what we may conclude to be the motives of the defendant, he failed in the effort and no delay was occasioned by his having made the application. Can it be said that the appellant lost his right to defend in person by his unsuccessful effort to have his trial postponed to get other counsel? We think not. The right to defend in person certainly should not be denied an accused in a situation where he must either choose to use it or proceed with counsel in whom he has lost confidence. We hold that the court erred in denying appellant the right to try his case without the aid of counsel and that because of this error he is entitled to a new trial.

After oral argument of this case before this court, counsel for appellant were given leave to file a reply brief. In this brief counsel for appellant seek to have the court give consideration to two alleged errors, neither of which was advanced in the original brief filed by appellant and upon which we do not have the benefit of argument from counsel for the respondent. For this reason, and because the alleged errors relate to matters not likely to be an issue in a new trial of this case, we make no decision on these points. The judgment of conviction is reversed and the defendant granted a new trial.

McDONOUGH, C. J., and CROCKETT, and WADE, JJ., and COWLEY, District Judge, concur.

HENRIOD, J., having disqualified himself did not participate herein.

WOLFE, C. J., being disqualified did not participate in the hearing of this cause.