STATE of Utah, Plaintiff and Appellee,

v.

Eugene Nate WOODLAND, Defendant and Appellant.

No. 940390.

Supreme Court of Utah.

Sept. 19, 1997.

Jan Graham, Atty. Gen., J. Frederic Voros, Jr., Marian Decker, Asst. Attys. Gen., Salt Lake City, for plaintiff and appellee.

Randall T. Gaither, Salt Lake City, for defendant and appellant.

DURHAM, Justice:

Defendant Eugene Nate Woodland appeals his 1994 conviction for murder in the second degree, a first degree felony, and aggravated assault, a third degree felony. Woodland challenges the trial court's failure to find him incompetent to stand trial, to ensure that he knowingly waived his right to a mental illness-based defense, and to dismiss the case on speedy trial grounds. Woodland also argues that the trial court should have reduced the degree of his offense at sentencing. We have jurisdiction to hear these claims pursuant to section 78-2-2(3)(i) of the Utah Code. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Around 1986, defendant entered into a contract with the firm of Peacock and Larsen for construction of the Woodland Dinner Theater Garden Complex in Salt Lake City. After a significant period of work, Woodland fell behind in his payments to Peacock and Larsen and was eventually forced into bankruptcy. During the bankruptcy proceedings, Peacock and Larsen filed a lien on Woodland's property to protect its interests. Following Woodland's bankruptcy, Peacock and Larsen bid on and eventually purchased Woodland's property. In September 1989, Woodland contacted Harry Peacock by telephone to discuss the status of his former property. During their conversation, Woodland expressed his frustration over the fact that Peacock and Bruce Larsen had purchased the property. Woodland indicated that if Peacock and Larsen refused to settle with him, he would "settle it with other means." Woodland then demanded to speak with Bruce Larsen; Peacock referred him instead to their lawyer.

On March 28, 1990, Woodland entered his former dinner theater and shot and killed Bruce Larsen. After the shooting, two

workers who had witnessed the event followed Woodland to a nearby apartment complex. They tackled Woodland in an attempt to detain him until police could arrive, and in the struggle, Woodland shot one of them in the hand.

Woodland was arrested and charged with murder in the second degree and aggravated assault. He successfully challenged his competency to stand trial, and the court eventually dismissed the original charges without prejudice on April 30, 1993. New charges were filed in October 1993, and Woodland again challenged his competency to proceed. At the resultant competency hearing held February 1, 1994, the court reviewed the evaluations of three court-appointed physicians and found Woodland competent to proceed to trial. Another petition regarding competency was filed with the court on April 8, 1994, which led to two additional hearings in April and May 1994. The court again determined that Woodland was competent to stand trial.

In addition to the competency challenge, Woodland filed two pretrial motions with the court. The first was a motion to dismiss based on an alleged violation of his right to a speedy trial. The court rejected this motion, finding that the delay had been caused by "issues of [d]efendant's competency" and was not attributable to the State. The second was a "Motion to Inquire Into a Plea of Not Guilty By Reason of Insanity." In reviewing Woodland's ability to waive his defenses based on mental illness, the court conducted a lengthy in-court interview and concluded that Woodland's waiver was both voluntary and knowing.

At the conclusion of a four-day trial, Woodland was convicted of murder and aggravated assault. Prior to the sentencing hearing, he moved to reduce his conviction and sentence one degree. The court denied Woodland's

motion and imposed a five-to-life term for the murder of Bruce Larsen, with an additional zero-to-five-year firearm enhancement. The court also imposed a zero-to-five-year term for the crime of aggravated assault, with an additional one-year firearm enhancement, to be served consecutively.

Woodland claims that the trial court erred in (1) failing to find him incompetent to stand trial; (2) refusing to grant his motion to dismiss on speedy trial grounds; (3) failing to ensure that he knowingly waived his right to a mental illness defense; and (4) failing to reduce the degree of the offense at sentencing.

## I. COMPETENCE TO STAND TRIAL

Section 77–15–2 of the Utah Code defines competence for purposes of trial: Persons are incompetent to proceed when they are unable to have a rational and factual understanding of the charges and when they cannot reasonably consult with their counsel and participate in the proceedings against them. Woodland challenges the trial court's finding that he had the capability to consult with counsel with a reasonable degree of rational understanding.[1]

 The determination of whether a defendant is competent to proceed to trial is a mixed question of fact and law. *See State v. Lafferty*, 749 P.2d 1239, 1243 (Utah 1988). Woodland's challenge centers on the trial court's factual findings regarding his competency, not on the legal interpretation of statutory competence. Thus, the court's findings on Woodland's ability to consult with counsel with a reasonable degree of rational understanding is subject to a clearly erroneous standard of review. *See* Utah R. Civ. P. 52(a); *State v. Robertson*, 932 P.2d 1219, 1223 (Utah 1997); *Lafferty*, 749 P.2d at 1243–

1. Some question exists regarding a continuing disagreement between Woodland and his counsel about this issue on appeal. At oral argument, counsel conceded that even now, after conviction and on appeal, Woodland opposes the raising of the competency question. Woodland's counsel argues that his unwillingness to condone their efforts to assert this and similar defenses, even in the face of overwhelming evidence against Woodland, is a sign of his incompetence. At the

same time, the State argues that his refusal is proof that he is fully aware of the charges against him and that he should, in turn, be found competent. As discussed hereafter, we are persuaded that Woodland's exercise of his right to control his own defense does not render him incompetent to stand trial simply because his preferred defense is contrary to the advice of his attorneys or because it may be unrealistic.

44. In accordance with this standard, Woodland must marshal the evidence in a light most favorable to the findings of the trial court and show that evidence to be insufficient. *See Saunders v. Sharp*, 806 P.2d 198, 199 (Utah 1991) (per curiam); *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985).

■ As noted earlier, Woodland, initially charged in March of 1990, immediately filed a petition concerning his competency to proceed. The court ordered an evaluation. In view of the evaluations of the medical experts, the court initially found Woodland incompetent to proceed to trial. The trial court dismissed these charges in April 1993 because it determined that Woodland would probably never meet the competency requirements. The charges were refiled in October 1993 after changes in the law and in Woodland's condition.

■ At the first competency hearing after the refiling, the court and two of the three reviewing doctors recognized an improvement in Woodland's mental health and competence.[2] Regarding Woodland's ability to consult with counsel, one of the doctors testified that Woodland and his attorney seemed to "collaborat[e] O.K." In addition to this change in Woodland's functioning, the statutory definition of legal competence found in section 77–15–2 of the Utah Code changed. Effective May 3, 1993, subsection (2) was changed from "assist his counsel" to the less demanding "consult with his counsel." According to the new law, the subject of a competency inquiry need only display an ability to consult with counsel. He or she is not required to help or assist. Under the new statutory standard, and with the change in Woodland's condition, the trial court ruled that he was then competent to proceed.

The statutory changes in question are consistent with this court's determination that competency is established when a defendant can, but not necessarily will, assist or consult with counsel. *See Lafferty*, 749 P.2d at 1243;

*see also Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam). Woodland's improved mental condition and the statute's lowered standard for competency appropriately influenced the trial court's February 1994 reversal of its earlier finding of incompetence.

In addition to the foregoing basis for the trial court's ruling, the trial court's regular and consistent exposure to and contact with defendant throughout the case reassures us. For example, the trial judge indicated during sentencing that "[w]ith regard to Mr. Woodland's mental health conditions, this case has been uniquely challenging to the court system. I have received more information about Mr. Woodland than I have about any other criminal defendant since I have been a judge. There have been numerous evaluations of his mental health condition." The trial court is in a unique position as the trier of fact; we will not overturn its determination of a factual issue so long as the record fairly supports it. *See State v. Archuleta*, 850 P.2d 1232, 1240–41 (Utah 1993); *see also Lafferty v. Cook*, 949 F.2d 1546, 1549 (10th Cir.1991); *Saunders*, 806 P.2d at 199–200.

■ Woodland's counsel, however, maintains that this case is unique. Woodland has consistently asked his attorneys to forgo any defense based on insanity or diminished capacity, even in the face of overwhelming evidence of his guilt and the consequent unavailability of any other effective defense. Woodland's attorneys argue that his refusal to heed their sound legal advice is convincing proof of his inability to consult with counsel and, thus, his incompetence. We disagree.

■ That the accused has the right to control the nature of his or her defense is well established. *See State v. Wood*, 648 P.2d 71, 91 (Utah 1982); *see also* Utah Const. art. I, § 12; *Faretta v. California*, 422 U.S. 806, 834, 95 S.Ct. 2525, 2540–41, 45 L.Ed.2d 562 (1975) (identifying defendant's 6th Amendment right to conduct his defense);

2. Two of the experts testified that Woodland had improved and was able to discuss his situation and legal options to such a degree that he could most likely consult with his defense counsel. The third doctor disagreed and stated that Woodland could not rationally consult with counsel.

The third expert based his opinion, however, on the assumption that Woodland's explanation of the crime was so unbelievable that his demand that his counsel pursue such a defense itself demonstrated his inability to consult with his legal representatives.

*State v. Penderville,* 2 Utah 2d 281, 272 P.2d 195, 199 (1954) (recognizing defendant's right under Utah Constitution to control his defense and represent himself). In *Wood,* for example, this court held that "an attorney acts as an assistant for his client, and not as a master." *Wood,* 648 P.2d at 91. According to the factual findings of the trial court, Woodland understood the charges against him and chose to assist and consult with his attorneys by requesting a particular defense. While his decision may have been legally imprudent, it cannot in and of itself constitute incompetence. Such a result would effectively remove a defendant's constitutional right to control his defense. Moreover, it would render the classification of incompetence overly broad. Rather than evidencing a willingness to agree with counsel, a defendant need only display the ability to consult with his defense in order to establish competency. *See Lafferty,* 749 P.2d at 1243.

## II. SPEEDY TRIAL

Woodland claims to have suffered a violation of his Sixth Amendment right to a speedy trial under the United States Constitution. He contends that he suffered a four-year and two-month total delay between the filing of the original charges on March 30, 1990, and his trial on the reinstated charges on June 7, 1994. According to Woodland, such a lengthy delay is presumptively prejudicial and thus sufficient to trigger a threshold speedy trial inquiry. *See Doggett v. United States,* 505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 2691 n. 1, 120 L.Ed.2d 520 (1992).

As we have noted, "The right to a speedy trial is different in character from the other fundamental rights guaranteed in the federal constitution." *State v. Trafny,* 799 P.2d 704, 706 (Utah 1990). This difference exists because a delayed trial can often benefit the defendant. Defendants may encourage delays in order to enhance their preparation, unsettle witness testimony, force a favorable plea bargain, etc. As a result, the "deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself." *Barker v. Wingo,* 407 U.S. 514, 521, 92 S.Ct. 2182, 2187, 33 L.Ed.2d 101 (1972).

The length of delay is usually the starting point for any speedy trial evaluation. *See Barker,* 407 U.S. at 530, 92 S.Ct. at 2192. In *Doggett,* for example, the Court noted that a post-accusation delay nearing one year is potentially prejudicial and therefore warrants a full review. *See Doggett,* 505 U.S. at 652 n. 1, 112 S.Ct. at 2691 n. 1. In addition to the length of delay, the Court has identified other factors to be considered once a presumptively prejudicial delay has been established: (1) the reason for the delay, (2) the defendant's assertion of the right, and (3) the prejudice to the defendant from the delay. *See Barker,* 407 U.S. at 530, 92 S.Ct. at 2192.

■ Woodland maintains that he has suffered a presumptively prejudicial delay of four years and two months. Woodland bases this figure on his assumption that, for purposes of determining the existence of a speedy trial violation, the period began to run when the initial charges were filed on March 28, 1990, and ended with the first day of the trial, June 7, 1994. The assumption is in error.

On April 30, 1993, the court dismissed all the charges against Woodland without prejudice. In October of 1993, new charges were filed. During the approximately seven months separating the dismissal and the reinstatement of charges, Woodland was confined in a mental institution. This period of confinement involved no formal charges. Woodland was not held because he was an alleged criminal but because his mental health at the time warranted such confinement. This period should not be used to calculate a speedy trial violation. *See Trafny,* 799 P.2d at 706 (stating that time spent holding defendant on separate parole violation following formal dismissal of charges cannot be attributable to state); *see also Johnson v. United States,* 333 F.2d 371, 374 (10th Cir.1964) (holding that "[a]ppellant can not complain of the denial of his constitutional right to a speedy trial because of his confinement in a State mental institution after dismissal of the former indictment").

■ The State filed new charges against Woodland on October 26, 1993. In a minute entry dated February 28, 1994, Woodland

waived his right to a speedy trial on the newly filed charges, and the court set June 7, 1994, as the trial date. We have previously refused to evaluate a speedy trial claim when the right has been affirmatively waived. *See State v. Smith,* 700 P.2d 1106, 1109 (Utah 1985). As a result, we need not determine the legitimacy of Woodland's claimed speedy trial violation for the period from the October 1993 filing of the new charges up through the trial beginning on June 7, 1994.

■ Woodland is thus left with a claimed delay of three years and one month, beginning with the original charges filed March 30, 1990, and concluding with their dismissal on April 30, 1993. According to the test established in *Barker,* a substantial delay is enough to trigger a threshold speedy trial inquiry. *See Barker,* 407 U.S. at 530–31, 92 S.Ct. at 2191–92; *Doggett,* 505 U.S. at 652 n. 1, 112 S.Ct. at 2691 n. 1. Thus, Woodland's delay of three years and one month is potentially, but not necessarily, prejudicial. *See Doggett,* 505 U.S. at 652, 112 S.Ct. at 2690–91; *State v. Ossana,* 739 P.2d 628, 632 (Utah 1987). Because the length of the delay is only a starting point, we must also evaluate other factors.

■ The second and often dispositive factor involved in questions of speedy trial is the cause of delay. *See Barker,* 407 U.S. at 530–31, 92 S.Ct. at 2191–92. The trial court found, "All of the delays since charges were originally filed in 1990 have been based on issues of Defendant's competency to proceed." That delays caused by questions of competency do not impinge on an accused's right to a speedy trial is well established. *See Johnson,* 333 F.2d at 374; *United States v. Abou–Kassem,* 78 F.3d 161 (5th Cir.1996) (stating that where defendant requests mental evaluation, resulting delay does not violate right to speedy trial); *Lokos v. Capps,* 625 F.2d 1258, 1268 n. 5 (5th Cir.1980) (holding that delay resulting from prior incompetence to stand trial does not violate speedy trial guarantee). Because time spent evaluating competency may not be considered in the speedy trial analysis, Woodland has suffered no prejudicial delay.

### III. WAIVER OF DEFENSES BASED ON MENTAL ILLNESS

Woodland next claims that the trial court erred in failing to ensure that he knowingly and voluntarily waived his right to a mental illness defense based on diminished capacity. He maintains that in so doing, the trial court denied him the opportunity to have his sentence reduced from a specific to a general intent crime. *See State v. Sessions,* 645 P.2d 643 (Utah 1982) (indicating that diminished capacity is partial defense which establishes defendant's inability to form specific intent).

■ Even though a thorough colloquy is explicitly required only for effective waiver of rights guaranteed by the constitution, *Boykin v. Alabama,* 395 U.S. 238, 242–43, 89 S.Ct. 1709, 1711–12, 23 L.Ed.2d 274 (1969), the trial court held one with Woodland regarding his desire to waive his right to assert a mental illness defense. During the colloquy, Woodland indicated that in waiving his right to assert such a defense he knew that he could not call into question his mental state at the time of the shooting. The trial court further explored the reason for Woodland's decision to forgo such a defense and found that he wished to avoid the stigma associated with any mental illness-based defense. While such a decision may seem legally imprudent in light of Woodland's circumstances, the desire to " 'avoid the stigma that typically accompanies an adjudication of insanity—a stigma that often surpasses that accompanying a criminal conviction' "—can be deemed rational. Wayne R. LaFave et al., *Criminal Law* § 4.5(a) n. 16 (2d ed.1986) (quoting Note, 65 Minn. L.Rev. 927, 945–46 (1981)).

■ Furthermore, this court has already recognized a competent defendant's right to exert control over his or her defense. *See Wood,* 648 P.2d at 91; *see also United States v. Marble,* 940 F.2d 1543, 1548 (D.C.Cir.1991) (finding that court should respect competent defendant's decision not to raise mental illness defense). Therefore, Woodland should not be required to display a heightened level of competency to waive his right to a particular defense. *See Godinez v. Moran,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (holding that competency standard for stand-

ing trial is same as standard for determining competency to waive right to counsel). The trial court correctly concluded that Woodland knowingly and voluntarily waived his right to assert a mental illness defense.

## IV. SENTENCE

Woodland next argues that pursuant to section 76–3–402 of the Utah Code, his sentence should have been reduced one degree due to the existence of a variety of mitigating factors. According to Woodland, those factors include diminished capacity, advanced age, and lack of a prior record.

▮ We traditionally afford the trial court wide latitude and discretion in sentencing. This court has held, "An appellate court will set aside a sentence imposed by the trial court if the sentence represents an abuse of discretion." *State v. Gibbons,* 779 P.2d 1133, 1135 (Utah 1989); *see also State v. Shelby,* 728 P.2d 987, 988 (Utah 1986) (per curiam); *State v. Nuttal,* 861 P.2d 454, 456 (Utah Ct.App.1993). Sentencing requires such discretion because it "necessarily reflects the personal judgment of the court." *State v. Gerrard,* 584 P.2d 885, 887 (Utah 1978) (citation omitted). Thus, a sentence imposed by the trial court should be overturned only when it is inherently unfair or clearly excessive. *See State v. Russell,* 791 P.2d 188, 192–93 (Utah 1990).

Woodland fails to meet his burden on this question. The trial court was fully aware of Woodland's unique situation, having presided over the competency determination and the trial. For example, the judge observed, "I have received more information about Mr. Woodland than I have about any other criminal defendant since I have been a judge." The record provides no basis for a finding of abuse of discretion. *See Gibbons,* 779 P.2d at 1135.

## CONCLUSION

▮ We conclude that (1) the trial court properly found Woodland competent to stand trial; (2) Woodland suffered no violation of his right to a speedy trial; (3) the trial court appropriately protected Woodland's right to waive his mental illness defenses knowingly and voluntarily; and (4) the trial court was

within the bounds of discretion in choosing not to reduce Woodland's sentence. We therefore affirm the judgment of conviction and sentence but remand to vacate the firearm enhancement sentence attaching to the assault charge. Section 76–3–203(3) of the Utah Code allows for the imposition of a zero-to-five-year indeterminate sentencing enhancement when a firearm is used in the case of a third degree felony. The State's brief points out that the trial court improperly enhanced Woodland's zero-to-five-year term for aggravated assault with a determinate one-year term rather than the indeterminate zero-to-five-year term allowed by the statute. Consequently, the enhancement is illegal. The State, however, will waive the enhanced firearm penalty in light of the extensive proceedings already undertaken in this case and the length of the legally imposed sentence. Therefore, the trial court's one-year determinate enhancement penalty for use of a firearm in the commission of a third degree felony should be vacated on remand.

ZIMMERMAN, C.J., and RUSSON, J., concur in Justice DURHAM's opinion.

HOWE, Justice, concurring in part and dissenting in part:

I concur only in the first point in Associate Chief Justice Stewart's dissenting opinion. Otherwise, I concur in Justice Durham's opinion.

STEWART, Associate Chief Justice, dissenting:

I dissent. While I agree that the majority correctly analyzes the first prong of the competency standard as to Woodland's present understanding of the proceedings against him, I do not believe that the majority correctly analyzes the second prong, relating to Woodland's ability to assist or consult with counsel.

First, the majority explicitly assumes that "subsection (2) [of section 77–15–2] was changed from 'assist his counsel' to the less demanding 'consult with his counsel.'" In my view, the assertion that the amendment rendered the standard less demanding is not

correct. The phrase stating that a defendant must be able to "consult with his counsel" is drawn directly from *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)(per curiam).[1] Supreme Court cases subsequent to *Dusky* have indicated that there is no substantive distinction between the ability to "consult" with counsel and the ability to "assist" counsel. In fact, Supreme Court opinions have employed the terms "consult" and "assist" interchangeably and synonymously within the text of the same opinions. *See Godinez v. Moran*, 509 U.S. 389, 392, 402, 113 S.Ct. 2680, 2683, 2688, 125 L.Ed.2d 321 (1993) (assist); *id.* at 396, 398, 113 S.Ct. at 2685, 2686 (consult); *Medina v. California*, 505 U.S. 437, 440, 450, 112 S.Ct. 2572, 2574, 2579–80, 120 L.Ed.2d 353 (1992) (assist); *id.* at 448, 112 S.Ct. at 2578–79 (consult); *see also Vincent v. Louisiana*, 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985) (Brennan, J., dissenting from denial of certiorari) (assist); *id.* at 1167, 105 S.Ct. at 929 (consult). Consequently, section 77–15–2 should not be construed as permitting a lesser standard for determinations of competence than the previous version of the statute.

Second, the majority assumes that Woodland's bizarre version of the events occurring on the day of Bruce Larsen's death does not affect Woodland's present ability to stand trial. I disagree. Although Woodland appears to have achieved a relatively lucid mental state at present, he clearly was in a highly delusional state of mind for a significant period of time after the homicide. He was adjudged incompetent to stand trial on at least two separate occasions. Testimony at various competency hearings indicates that he was also delusional on the day of the killing. Notwithstanding Woodland's apparent partial recovery, he has continued to assert a memory of events at trial that is derived directly from that delusional state.

Third, the testimony presented by the psychiatrists at the competency hearing provided only minimal support for the trial court's ruling of competency. One psychiatrist, Dr. Gardner, found Woodland competent; another, Dr. Heinbecker, found him incompetent; and the third, Dr. Hummel, offered an equivocal opinion. Dr. Hummel noted that he had a conflict of interest, and the trial court stated that it did not rely heavily upon his testimony. Hummel and Heinbecker both expressed serious reservations about Woodland's ability, in light of the delusional view he possessed of the historical events relating to the crime, to assist or consult with counsel. Dr. Heinbecker found that Woodland's inability to perceive the events surrounding the crime in a rational manner prevented him from consulting with counsel adequately. Although the State claims that Hummel's ultimate conclusion was that Woodland was competent, that claim is taken out of context. Hummel in fact stated an opinion that is similar to Heinbecker's in that Hummel felt Woodland's competency depended upon the legal interpretation of the standard at issue. To the extent Woodland was unable to cooperate with his counsel by presenting a nondelusional version of the events surrounding the crime, Hummel expressed doubts about Woodland's competency: "If 'consult with counsel with a reasonable degree of rational understanding' includes defendant's ability to communicate with his attorney, to aid in his defense, and to have a working relationship with his attorney, then I would question Mr. Woodland's competence to stand trial."

The majority asserts that a defendant's unwise or improbable version of historical events does not constitute a reason for finding the defendant incompetent. I submit that this proposition oversimplifies the issue. It is true that defendants who are otherwise competent are clearly entitled to choose their trial strategy, no matter how absurd or unlikely it may be. It is unfortunately relatively common for criminal defendants to entertain paranoid and unrealistic views of the world, believing that the charges against them are the result of a conspiracy. Not-

---

1. *Dusky* offered no citation or rationale for the proffered language. Indeed, the *Dusky* "standard" appears to merely have been drawn verbatim from the government's brief in that case and was neither explicitly approved nor disapproved by the Supreme Court. Later cases, however, have ignored this critical fact and have repeatedly cited the *Dusky* language as the binding standard.

withstanding an unrealistic view, they are generally entitled to pursue their perspective as to what happened and to hope that the jury will find them more credible than the witnesses against them.

That choice, however, is far removed from an inability to confront reality that arises out of a severe mental pathology. I believe that such a scenario as is presented in this case undermines the finding of competence. A defendant who was delusional at the time of a crime and whose perspective at the time of trial continues to be distorted by those delusional beliefs cannot rationally consult with counsel about the key issues of the trial.