2002 UT 86

**STATE of Utah, Plaintiff and Appellant,**

v.

**Terril CALLIHAM, Defendant and Appellee.**

No. 20000169.

Supreme Court of Utah.

Aug. 16, 2002.

Mark L. Shurtleff, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen., Salt Lake City, Craig C. Halls, San Juan County, for plaintiff.

Stephen R. McCaughey, Salt Lake City, for defendant.

DURHAM, Chief Justice:

¶ 1 Two brothers, Jordan and Terril Calliham (collectively, "the Calliham brothers"), were convicted of murder for the killing of their friend and classmate James Eaton ("Eaton"). Terril Calliham ("Terril") ap-

peals,[1] claiming that the trial court erred in denying his request for a psychological evaluation of the State's primary witness and in refusing to sever his trial from that of his brother. In addition, Terril claims that the trial court erred in denying his motions for a mistrial, that the trial court improperly removed two potential jurors for cause, that the prosecutor engaged in misconduct by arguing accomplice liability to the jury, and that the trial court erred in reading certain passages of the trial transcript to the jury at the jury's request after deliberations had begun. We affirm Terril's conviction.

## BACKGROUND

### I. BACKGROUND OF THE CRIME

¶ 2 Eaton, the Calliham brothers, and Misty Ernst ("Ernst"), the girlfriend of Jordan Calliham ("Jordan"), were residents of Dove Creek, Colorado. In April 1999, when Eaton's parents could not locate him, they filed a missing persons report with the county sheriff's department. Six days later, Eaton's body was found near Ucolo Road, approximately a mile inside the Utah border. He had been shot at least nineteen times. Following a criminal investigation, the Calliham brothers were arrested and charged with murder.

¶ 3 At trial, the State offered evidence suggesting the following fact scenario. Eaton and Jordan were best friends; however, Jordan suspected that Eaton had stolen some drugs from him. On the evening of April 3, 1999, Eaton joined Terril, Jordan and Ernst on a drive to a nearby town where they planned to purchase illegal drugs. The group had planned to make the purchase in Cortez, but Ernst suggested they could buy drugs cheaper in Monticello, so they headed in that direction. While driving, Eaton suggested they smoke a joint of marijuana. Jordan whispered to Ernst to not let them smoke in the car.[2] Ernst complied, and Eaton suggested they turn onto Ucolo Road and

park the car. After parking, Ernst stayed at the car, while the three men went beyond a grove of trees to smoke the joint. Ernst at first heard them laughing; then she heard a gun shot, followed by a volley of fifteen or more shots. During the shots, Ernst heard Eaton crying and asking, "Why did you kill me?" After a brief pause, Ernst heard a final shot. When the Calliham brothers came running back to the car, Ernst asked if Eaton was dead. Jordan stated he had "finished James off in the head" and that he had fired the final shot after clearing a gun jam. He also explained how Eaton had tried to shield himself from the bullets with his hands. Terril stated that Eaton did not immediately fall when he shot him and that he had thought he might have to kick Eaton over.

¶ 4 After the murder, the Calliham brothers split up, in an apparent effort to establish alibis. Terril was dropped off in Dove Creek, while Jordan and Ernst drove to Cortez. Just after dropping off Terril, Jordan called Terril on his cell phone to make it look as though Jordan were already in Cortez. After arriving in Cortez, Jordan spoke with a friend, Michael Gentry ("Gentry"), while Ernst waited in the car. Asked how things were going, Jordan told Gentry he had "solved his problems" and gestured as though he were pulling the trigger of a gun. Jordan asked Gentry to tell anyone who asked that Jordan had been there that night. When he returned to the car, Jordan told Ernst that he had told Gentry "what him [i.e., Jordan] and Terril had done."

¶ 5 That evening, Jordan showed Ernst the blood-spattered guns he and Terril had used in the shooting. Later, while in jail awaiting trial, Jordan admitted to other prisoners that he had been involved in the killing, showed them how he had held his gun, and imitated the way Eaton's body vibrated as it was impacted by bullets.

¶ 6 At trial, Terril offered evidence that he was not present when the murder took place.

---

1. Jordan Calliham also appeals his conviction, which we address in a separate opinion. *See State v. Calliham*, 2002 UT 87, 57 P.3d 220.

2. Ernst testified that she found this request unusual since they usually smoked in the car. She

stated that, at the time, the request made her suspect that Jordan planned to beat up Eaton when they pulled over.

The Calliham brothers also offered evidence to show that Ernst, the State's primary witness, had made inconsistent statements about the killing and had a reputation in the community for being dishonest. In addition, they offered evidence to suggest that someone other than the Calliham brothers had a motive to kill Eaton and had threatened to kill Eaton.

¶ 7 At the close of a three-day trial, the jury found Jordan and Terril guilty of criminal homicide.

## II. PROCEDURAL HISTORY

¶ 8 Terril, Jordan, and Ernst were charged with criminal homicide, a first-degree felony, under Utah Code Ann. § 76–5–203 (2001). When Ernst agreed to testify for the State, the charge against her was reduced to attempted obstruction of justice, to which she pled guilty. After a preliminary hearing, the Calliham brothers were bound over for trial.

### A. Pretrial Motions

¶ 9 The Calliham brothers made a number of pretrial motions. Terril moved to have his trial severed from that of his brother.[3] The court denied the motion to sever, stating that Terril had failed to demonstrate that he would be prejudiced by a joint trial. The court stated that its ruling might be reconsidered if and when the prosecution decided to use statements of either defendant at trial.

¶ 10 Jordan moved to require Ernst to submit to a psychological evaluation, and Terril joined in the motion. They argued that Ernst's testimony at the preliminary hearing suggested that she experienced hallucinations, had difficulty distinguishing dreams from reality, and manifested a propensity to lie. Ernst opposed the motion, stating that she had no history of mental illness and that any inconsistencies in her testimony at the hearing were due to normal emotional turmoil. The court denied the motion for an evaluation. It held that there was no evidence that Ernst had suffered from mental illness in the past and that the hear-

ing transcript gave no indication that she was unable to differentiate dreams from reality or to testify truthfully. The court stated that "absent evidence of actual mental illness, the court will not order an examination to fish for it."

¶ 11 Jordan also moved to exclude from evidence crime scene and autopsy photographs of the victim. He argued that the photos were gruesome, would unfairly prejudice the jury, and were of no probative value because the manner in which the victim died was not disputed. The State argued that the photographs were essential to bolster its prosecution witnesses' testimony about where and how the crime occurred. The court denied the motion with regard to the crime scene photographs but granted it with respect to all but two autopsy photos. It held that the crime scene photographs were not gruesome and that the two autopsy photographs were highly relevant to showing that the final wound was inflicted at close range.

### B. Renewed Motion for Severance and Motions for Mistrial

¶ 12 Prior to trial, the Calliham brothers anticipated that the State planned to introduce the testimony of persons who had been in jail with Jordan. These informants were expected to testify about inculpatory statements made by Jordan while in jail. Upon finding that the State planned to use this testimony, Terril renewed his motion for severance, claiming that admission of Jordan's statements would prejudice Terril.[4]

¶ 13 In an unrecorded conference before trial, the parties discussed the admission of this testimony with the court. The court determined that because Jordan was not going to testify, use of Jordan's statements against Terril would violate Terril's constitutional right to confront the witnesses against him. The court therefore ruled that the witnesses could testify to Jordan's statements, but that the testimony must be limit-

---

**3.** Jordan did not join in the motion to sever.

**4.** The motion states that "A Memorandum in Support of this Motion follows." However, no such memorandum exists in the record. According to the State, the memorandum was never filed.

ed so that it would not mention or implicate Terril. The witnesses were to be instructed that, when relating Jordan's admissions, the witnesses must replace Jordan's pronoun "we" with "I." Also, to ensure that the witnesses did not inadvertently implicate Terril, the court instructed counsel to lead the witnesses. Further, the court instructed Jordan's counsel that she could not cross-examine in a way that might elicit from the witnesses any testimony that Jordan had said there was another person with him at the time of the killing.

¶ 14 The court later repeated its ruling on the record. Jordan objected to the redactions in his statements, arguing that the redaction prevented him from arguing that he was merely a passive observer when the killing took place. Jordan also objected to the court's decision to allow the State to use leading questions and to the limits the court imposed on the scope of cross examination.[5] The court overruled the objections, holding that the redaction was in no way prejudicial because the statements in their original form did not suggest that Jordan had merely been an observer.

¶ 15 At trial, the State's first witness was Ernst. During direct examination, Ernst testified that after the murder, Jordan told her that he had told Gentry "what him [i.e., Jordan] and Terril had done." Immediately following Ernst's testimony, Terril moved for a mistrial. Terril argued that Ernst's failure to omit reference to Terril in recounting Jordan's statement was in violation of his constitutional rights because it inculpated Terril without giving him an opportunity to cross-examine Jordan about the statement. The court denied the motion, holding that the reference to Terril had no prejudicial effect. Ernst had already implicated Terril directly in describing the killing; thus, if the jury believed her with regard to the events she claimed she witnessed, her testimony about Jordan's statement could be no more damaging.

¶ 16 Later in the trial, the State called a number of witnesses who had been in jail with Jordan. These informants testified to statements made by Jordan wherein he admitted to being involved in the killing. The State was allowed to lead each witness so that Terril would not be implicated by the admissions. The jury was instructed that the testimony of the informants could only be considered in assessing Jordan's guilt or innocence and could not be used against Terril.

¶ 17 At the close of the evidence, the court asked Terril's counsel if he wanted to renew his motion for a mistrial or for severance. After consulting with his client, Terril's counsel declined. The following morning, however, Terril reasserted his motion for a mistrial. He argued that there was considerably more evidence against Jordan than there was against him and that the evidence against Jordan would have a prejudicial "spillover" effect on him. He stated that the jury might believe Jordan to be guilty and then assume, based primarily on the evidence against Jordan, that Terril must also be guilty. The court denied the motion. It held that Terril was benefitted, rather than prejudiced, by the joint trial, because it enabled Terril to make arguments about the comparative lack of evidence against him and the defenses he had which Jordan did not. Further, Terril would be permitted in closing to argue that Jordan's admissions did not implicate Terril.

### C. Jury Questions and Verdicts

¶ 18 During its deliberations, the jury sent a note to the trial judge requesting a certain portion of the "testimony transcripts." The official transcript was not yet available, and the Calliham brothers objected to providing the jury with a videotape of the proceedings. The judge informed the jury that the transcript was unavailable. He stated he would not provide the transcript unless absolutely necessary and encouraged them to reach a verdict based on the information they had. After twelve hours of deliberations, the jury found Jordan guilty of the charged offense. Before rendering a verdict on the charge

---

5. Before trial, Terril moved to sever his charges, asserting that redaction would not sufficiently protect him from being prejudiced by Jordan's statements. After the pretrial conference described herein, however, Terril did not join in any of Jordan's objections or make any objection of his own to the court's resolution of the matter.

against Terril, however, the jury asked that the court read back a portion of the record wherein Ernst explained why she had changed her story. The court read to the jury two excerpts from the transcript. Terril did not object. After deliberating again, the jury found Terril guilty of criminal homicide.

## ANALYSIS

¶ 19 In this appeal, Terril asserts that the trial court erred in denying his request for a psychological evaluation of Ernst, in refusing to sever the trials, in denying his motions for a mistrial, and in removing two potential jurors for cause. Terril also claims that the prosecutor engaged in misconduct by arguing accomplice liability to the jury, and that the trial court erred in reading certain passages of the trial transcript to the jury at the jury's request after deliberations had begun.

## I. MOTION FOR A PSYCHOLOGICAL EVALUATION

¶ 20 Before trial, Jordan moved for a psychological evaluation of Ernst, and Terril joined in the motion. The State took no position on the motion; Ernst submitted a memorandum in opposition. In their motion, the Calliham brothers claimed that there was "great doubt" about Ernst's ability to perceive, remember, and communicate facts accurately. They stated that at the preliminary hearing Ernst "admitted to having difficulty distinguishing between what was real and what was a dream," that she "stated that she hallucinates," that she "went from uncontrollably crying to giggling and joking in a few short minutes," that she "admitted to using illegal drugs" including "marijuana, a known hallucinogen," and that she admitted to "being untruthful to her parents."

¶ 21 After reviewing the preliminary hearing transcript, the trial court denied the motion. The trial court found the following:

[T]he only hint of mental illness is the adoption by the witness of defense counsel's characterization of her dreams as "hallucinations." There is no evidence of mental illness preceding the crime. The transcript does not suggest to the court that [Ernst] suffers from mental illness.

To the contrary, [Ernst] appears capable of distinguishing between what happened, what she dreamed, what she worried about, what she told officers on different occasions, what she wanted to say, what she heard from others, and what Jordan and his brother might want her to say. If the court were to order a psychiatric examination based on [Ernst's] preliminary hearing testimony, an examination would be required in virtually all cases.

### A. Standard of Review .

¶ 22 We have long held that the determination whether to order a psychological examination rests largely within the discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion. See State v. Lairby, 699 P.2d 1187, 1197 (Utah 1984); State v. Hubbard, 601 P.2d 929, 930 (Utah 1979); Stone v. Stone, 19 Utah 2d 378, 431 P.2d 802, 803 (1967); State v. Braun, 787 P.2d 1336, 1343 (Utah Ct.App.1990); see also State v. Scott, 22 Utah 2d 27, 30, 447 P.2d 908, 911 (1968) (trial court's determination of competency reviewed for abuse of discretion); State v. Snowden, 23 Utah 318, 327, 65 P. 479, 481 (1901) (same). Notwithstanding this precedent, Terril argues that this court should review this issue for correctness. He says that in this case there is no cause to give deference to the trial court because the trial judge based his ruling on the preliminary trial transcript, which is readily available to this court. The trial court, he argues, was in no more an advantaged position to determine the need for an evaluation than we are.

¶ 23 We review most evidentiary rulings and questions of fact with deference to the trial court based on the presumption that the trial judge, having personally observed the quality of the evidence, the tenor of the proceedings, and the demeanor of the parties, is in a better position to perceive the subtleties at issue than we can looking only at the cold record. See State v. Pena, 869 P.2d 932, 935–36 (Utah 1994). We decline to depart from this tradition in this case. While it is true that the trial court based its ruling primarily upon the preliminary trial transcript, it was not entirely limited to the tran-

script, as we are. Had the court found the transcript inconclusive, it could have held an evidentiary hearing to gather more information on the mental state of the witness. Further, the trial court had the benefit of viewing the parties and the witnesses throughout the course of the trial. If during the trial the court had seen evidence of the witness's incompetence, it could have responded to a renewed motion for an evaluation or raised the issue sua sponte. The fact that this did not happen does not mean the trial court's perspective was of no enhanced value; it merely means the court saw no cause to formally expand the inquiry into Ernst's mental state.

 ¶ 24 We therefore review the trial court's ruling for an abuse of discretion. We will reverse only if we find, based on the preliminary trial transcript, that the court's factual findings were against the great weight of the evidence. *Id.* We review for correctness whether the trial court applied the appropriate rule of law. *Id.* at 936.

### B. Application

 ¶ 25 A trial court's power to order an individual to submit to a psychological evaluation derives from its discretion to qualify a witness as competent. *See State v. R.W.,* 104 N.J. 14, 514 A.2d 1287, 1290 (N.J.1986). Utah law imposes a very low bar for establishing the competency of a witness. Under section 78–24–1 of the Utah Code, "[a]ll persons, without exception, otherwise than as specified in this chapter, who, having organs of sense, can perceive, and, perceiving, can make known their perceptions to others, may be witnesses." Utah Code Ann. § 78–24–1 (2001).

 ¶ 26 Similarly, rule 601 of the Utah Rules of Evidence provides that "[e]very person is competent to be a witness except as otherwise provided in these rules." Utah R. Evid. 601. The language of this rule "was meant to abolish age, mental capacity, and

other grounds which used to render a person incompetent as a witness." *State v. Fulton,* 742 P.2d 1208, 1217 (Utah 1987); *see also State v. Eldredge,* 773 P.2d 29, 33 (Utah 1989) (holding that rule 602 "merely requires that the witness have the opportunity and the capacity to perceive the events in question").

 ¶ 27 Once a witness is deemed competent, matters of credibility are best left to the jury. "[I]n our judicial system it is the role of juries to decide how much weight to give the testimony of particular witnesses, not the role of independent experts." *State v. Hubbard,* 2002 UT 45, ¶ 16, 48 P.3d 953.

 ¶ 28 Given the low threshold for competency and the preference for leaving matters of credibility to the judgment of the jury, we have articulated a standard that will require a witness to submit to a psychological evaluation only when there are legitimate doubts about the witness's ability to testify accurately and truthfully and those doubts cannot adequately be investigated through cross examination. *See, e.g., Lairby,* 699 P.2d at 1197; *see also United States v. Brown,* 770 F.2d 768, 770 (9th Cir.1985) (holding that trial court did not abuse discretion in denying motion for psychological examination where witnesses were extensively cross-examined concerning their drug use and mental problems). Thus, the court may order a witness to submit to a psychological examination if "there is substantial doubt that a witness is capable of understanding and appreciating the duty to tell the truth, or that he is able to perceive, remember, and communicate facts with reasonable accuracy."[6] *State v. Hubbard,* 601 P.2d 929, 930 (Utah 1979). In order to show substantial doubt, "the party requesting the testing must present evidence reasonably indicating something peculiar, unique, or abnormal about the ... witness that would influence the witness's competence or the court's ability to assess that competence, or raise unusu-

---

6. This standard does not apply where a psychological evaluation of a witness has already been performed and the prosecutor seeks to avoid turning the evaluation over to the defense. A prosecutor must turn over evidence if it is constitutionally material, that is, if the evaluation

" 'may reasonably cast doubt on the ability or willingness of a witness to tell the truth.' " *State v. Bakalov,* 1999 UT 45, ¶¶ 31–32, 979 P.2d 799 (quoting *United States v. Smith,* 77 F.3d 511, 516 (D.C.Cir.1996)).

al difficulties in assessing the witness's credibility." *R.W.*, 514 A.2d at 1291. Because mandating a psychological evaluation can potentially invade the privacy of the witness and discourage other witnesses from coming forward, such a motion should not be granted lightly. *See Stone v. Stone*, 19 Utah 2d 378, 431 P.2d 802, 804 (1967) ("The question of a person's sanity nearly always involves considerable delicacy.... [T]he court would always be well advised in exercising caution and restraint in regard to such a request...."); *R.W.*, 514 A.2d at 1294 ("[T]he possible evidentiary benefits to a defendant flowing from such a court-ordered examination of the witness are outweighed by the resulting invasion of the witness's right to privacy and the danger to the public interest from discouraging victims of crime to report and assist in the prosecution of such offenses.").

¶ 29 Terril claims that the trial judge inappropriately considered only whether Ernst had a past history of psychological problems. The standard set forth above requires the court to consider both the past and present mental state of the witness, insofar as these are relevant to the witness's ability to perceive and relate the events accurately. *See, e.g., State v. Stewart*, 925 P.2d 598, 600 (Utah Ct.App.1996). We find it evident from the trial court's order denying the motion that it considered both Ernst's past and present mental state. In addition to finding no mental illness preceding the crime, the trial court specifically addressed Ernst's current ability to testify:

> The transcript does not suggest to the court that [Ernst] suffers from mental illness. To the contrary, [Ernst] appears capable of distinguishing between what happened, what she dreamed, what she worried about, what she told officers on

different occasions, what she wanted to say, what she heard from others, and what Jordan and his brother might want her to say.

Clearly, the court was concerned with more than Ernst's past mental history.

¶ 30 Terril also claims that the trial court's finding that Ernst was capable of testifying truthfully and accurately was against the weight of the evidence. First, he claims the trial court erred in failing to find that Ernst had "questionable mental health" prior to the crime. Based on Ernst's statements at the preliminary hearing, Terril asserts that before the crime Ernst had a sexual relationship with a minor, used illegal drugs, and didn't take proper care of her child. Terril asserts that this gives ample cause to question her mental stability. However, Terril fails to explain how these conclusions manifest a psychological disorder that places in substantial doubt Ernst's ability to accurately perceive the crime. "[P]oor judgement alone does not prove a mental disorder," *State v. Billingsley*, 85 Or.App. 387, 736 P.2d 611, 613 (1987), nor does past drug use establish incompetency, *see State v. Eaton*, 569 P.2d 1114, 1116–17 (Utah 1977); *State v. Jiron*, 26 Utah 2d 311, 489 P.2d 109, 110 (1971); *State v. Thomas*, 554 P.2d 225, 227 (Utah 1976); *see also Carter v. State*, 2000–KA–00758 SCT ¶ 43, 799 So.2d 40 (Miss.2001) (collecting cases). Without more, the trial court had no cause to believe that Ernst's perceptive abilities were in serious doubt.

¶ 31 Second, Terril claims that the preliminary hearing transcript revealed that Ernst was unable to distinguish dreams and hallucinations from reality. He points specifically to a brief portion of the transcript where Ernst makes vague reference to "hallucinations."[7] After admitting that some of

---

7. Terril also points to Ernst's statement that she is good at deceiving people and various inconsistencies in Ernst's testimony. Viewing the record as a whole, however, we do not find that these create a substantial doubt as to Ernst's capacity. The fact that one considers oneself good at deceiving people does not make one incapable of understanding the duty to tell the truth. Further, while Ernst's inconsistent statements may "show[ ] the witness either became confused or lied while on the witness stand, [they] certainly

[do] not clearly prove that the witness's testimony was affected by a mental disorder." *Stewart*, 925 P.2d at 601. Ernst was interviewed on several occasions and, through the course of the investigation, apparently experienced mixed emotions about testifying against her former boyfriend Jordan. The incongruities in her testimony reflect emotional turmoil and vacillating loyalty to the Calliham brothers; but they do not raise a substantial doubt about her ability to

what she told police was based on rumors, rather than what she perceived herself, Ernst stated that "a lot of it too was just what was in my head." She then stated that she had "seen" Eaton after the murder:

Q: What kind of stuff did you see, Misty?

A: I saw James. I mean, I saw James every night.

Q: What do you mean when you say you saw him? You dreamt about it—

A: Yeah.

Q:—or he came back to see you?

A: He came back to see me and was telling me—

Q: Do you recognize now that these things were hallucinations?

A: Yeah.

Q: When you had these hallucinations, you thought they were true?

A: Yes.

. . . .

Q: And when you talked to the police officers, did you tell them things that were part of your hallucinations?

A: Well, I was telling them my halluc— whatever—

Q: Hallucinations?

A: Yeah.

Ernst's testimony could be construed to suggest that she suffered from hallucinations. It seems more likely, however, given the context of the testimony, the fact that there are no other references to hallucinations in the transcript, and the way in which defense counsel led Ernst to adopt the term "hallucinations," that she was merely referring to nightmares she had following the murder. Further, even if Ernst did at some point experience hallucinations, there was ample evidence in her testimony on which the trial court could rely in concluding that she was competent. Ernst's testimony clearly indicates that at the time of the preliminary hearing she was capable of distinguishing what had actually happened from her dreams, from what others had told her, and

from what she had said to police officers in the past. Given the clarity Ernst manifests in the preliminary hearing transcript and the scant evidence drawing into question her mental state, we find that the trial court did not abuse its discretion in denying the motion for a psychological evaluation.

## II. MOTION TO SEVER THE TRIALS AND MOTIONS FOR A MISTRIAL

■ ¶ 32 Terril asserts that the trial court violated his constitutional rights[8] by denying his motion for severance and his motions for a mistrial. In his brief, Terril integrates three specific claims of error: First, he asserts that because Jordan never testified at trial, Terril was denied his constitutional right to confront the witnesses against him when the trial court allowed witnesses to give testimony about inculpatory statements made by Jordan while in jail. Terril argues that, even though the statements were redacted so that they did not directly implicate Terril, the testimony nonetheless prejudiced him. Second, Terril claims that the redaction of the witnesses' statements resulted in the admission of false evidence, which undermined the integrity of the trial. Therefore, he argues, he was denied the right to a fair trial. Finally, he argues that the admission of Ernst's unredacted testimony, in combination with the testimony of a certain informant, compromised his right to confront the witnesses against him and was prejudicial.

### A. Admission of Jordan's Redacted Confessions

■■ ¶ 33 The State argues that Terril failed to preserve any of these claims of error for appeal. With regard to Terril's first two claims of error, we agree. Although Terril originally moved to sever, claiming that admission of Jordan's statements would be prejudicial, there is no record that he objected to the trial court's decision to redact the witnesses' statements, to allow counsel to

understand her oath or relate her perceptions accurately.

**8.** Terril claims the trial court violated his rights under both the United States Constitution and the Utah Constitution. We decline to address his claims under the Utah Constitution because he has failed to separately brief his state claims. *See State v. Ellis,* 748 P.2d 188, 190 (Utah 1987).

lead the witnesses, and to limit the scope of cross examination. In his original motion to sever, Terril stated that he believed redaction would not adequately protect him.[9] However, when the court addressed this issue at the pre-trial conference, Terril did not suggest that the limiting methods proposed by the trial court failed to resolve his concerns.[10] Since the limits imposed by the trial court were specifically intended to prevent Jordan's admissions from implicating Terril, Terril was obliged to make an objection on the record if he found these methods inadequate. *See State v. Brown,* 948 P.2d 337, 343 (Utah 1997) ("Defendants are thus not entitled to both the benefit of not objecting at trial and the benefit of objecting on appeal."). Terril did not join in Jordan's objections on the record or make any objection of his own.[11] To the contrary, Terril only objected after the State's primary witness, Ernst, exceeded the limits imposed upon other witnesses relating Jordan's statements. This objection, in conjunction with Terril's silence when the limiting methods were imposed, exhausted his ability to claim that the limiting methods prejudiced him or undermined his right to confront the witnesses against him.

¶ 34 Because Terril failed to preserve this claim, we review it for plain error.[12] Utah Code section 77–8a–1(4)(a) provides that if a defendant is prejudiced by joinder of trial, the court shall "grant a severance of defendants, or provide other relief as justice requires." Utah Code Ann. § 77–8a–1(4)(a)(2001); *see also* Utah R.Crim. P. 9(d). "Doubts concerning prejudice should be resolved by the trial court in favor of the defendant, but the trial court must be accorded some discretion in denying a motion for severance." *State v. Collins,* 612 P.2d

775, 777 (Utah 1980). Any error in denying severance will be deemed harmless unless defendant can "establish a reasonable likelihood of a more favorable outcome if the court had granted a severance." *State v. Ellis,* 748 P.2d 188, 190 (Utah 1987); *see also* Utah R.Crim. P. 30(a).

¶ 35 The trial court allowed four witnesses to testify to statements Jordan made while in jail awaiting trial. Terril asserts that in evaluating whether the testimony of these informants violated his right to confrontation, the trial court should have applied the test from *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In that case, the United States Supreme Court held that in order to use hearsay statements that implicate a defendant, there must be a showing that the declarant is unavailable and that there are adequate indicia of reliability to warrant the testimony. *Id.* at 66, 100 S.Ct. 2531. The *Roberts* test, however, has been used by the United States Supreme Court only where the hearsay statement directly implicates the defendant. *See, e.g., Lilly v. Virginia,* 527 U.S. 116, 134, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (accomplice statements implicating defendant); *Idaho v. Wright,* 497 U.S. 805, 818, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (victim statements implicating defendant); *United States v. Inadi,* 475 U.S. 387, 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986) (co-conspirator statements implicating defendant). In considering the admission of accomplice testimony, the Court has drawn a careful line between out-of-court statements that directly implicate a defendant and those that do not. *See Lilly,* 527 U.S. at 134, 119 S.Ct. 1887; *Richardson v. Marsh,* 481 U.S. 200, 207–08, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Bruton v. United*

---

9. Terril's motion stated that a supporting memorandum would follow; however, there is no record that such a memorandum was ever filed.

10. The trial court later summarized the events of the pretrial conference, stating that the court's resolution was "acceptable to [Terril's counsel], proposed by [the prosecutor], to which [Jordan's counsel] raised some objection. . . ."

11. It was inadvisable for the trial court to hold the pre-trial conference off the record, especially where, as here, the parties' fundamental rights were being discussed. Nonetheless, it was the

responsibility of the parties, not the trial court, to ensure that any objections were preserved in the record. *See State v. Worthen,* 765 P.2d 839, 845 (Utah 1988).

12. To establish plain error, appellant must show: "(i) An error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Dunn,* 850 P.2d 1201, 1208 (Utah 1993).

*States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In a number of cases and in a variety of contexts, the Court has held that jurors must be credited with the ability to follow the cautionary instructions given by the court. *See Richardson*, 481 U.S. at 206–207, 107 S.Ct. 1702 (collecting cases). In *Bruton*, the Court carved out a "narrow exception" to this rule, holding that, regardless of a limiting jury instruction, a defendant's Sixth Amendment right is violated "when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial." *Richardson*, 481 U.S. at 207, 107 S.Ct. 1702. The Court determined that where a confession "expressly implicates" the defendant, the jury cannot be assumed to consider such "powerfully incriminating" evidence only with regard to the guilt of the declarant. *Id.* at 208, 107 S.Ct. 1702 (quoting *Bruton*, 391 U.S. at 124 n. 1, 135, 88 S.Ct. 1620).

¶ 36 In *Richardson*, the Court clarified the reach of this exception. It held that where a confession is redacted "to eliminate not only the defendant's name, but any reference to his or her existence," the defendant's Sixth Amendment right is not violated by its admission, so long as the jury is instructed to consider the statement only as evidence of the declarant's guilt. *Id.* at 211, 107 S.Ct. 1702. Further, the Court stated that the fact that the confession may become incriminating when linked with other evidence introduced at trial does not make the redacted confession inadmissable. *Id.* at 208–11, 107 S.Ct. 1702; *see also State v. Ellis*, 748 P.2d 188, 190 (Utah 1987). The Court reasoned that if it were to prohibit admission of all statements that may be inferentially incriminating, it would undermine judicial efficiency and fundamental fairness by either making many joint trials impossible or forcing courts to forgo the use of confessions. *Richardson*, 481 U.S. at 208–10, 107 S.Ct. 1702.

¶ 37 In this case, the limiting methods imposed by the trial court prevented Jordan's statements from directly implicating Terril. Each of Jordan's statements was redacted so that all references to "we" (refer-

ring to himself and Terril) in the original, were changed to "I" (referring to Jordan) in the testimony given at trial. The prosecutor was instructed to lead the witnesses in recounting Jordan's confessions so that they would not inadvertently refer to Terril, and Jordan's counsel was not allowed to expand her cross examination to suggest that the confessions implicated Terril. Further, at the close of trial, the court instructed the jury to consider Jordan's confessions only with regard to Jordan's guilt. Indeed, it is hard to imagine what more the trial court could have done to prevent Jordan's admissions from directly implicating Terril. The trial court's refusal to sever the trials and its admission of the redacted statements were not erroneous.

### B. Limiting Methods Imposed by Trial Court

¶ 38 Terril's second claim is that the limiting methods imposed by the trial court allowed for the admission of "false" testimony and thereby undermined the integrity of the trial. Since this claim was not raised below, we review it for plain error.

¶ 39 Terril points to our past statement that "a criminal conviction procured by the knowing use of false testimony" must be vacated "if there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *State v. Hewitt*, 689 P.2d 22, 24 (Utah 1984). However, Terril fails to identify any false testimony offered at trial. None of the cases Terril cites in support of this claim have to do with the admission of redacted testimony. *See id.*; *Walker v. State*, 624 P.2d 687, 688–89 (Utah 1981). Rather, Terril relies upon cases wherein the State purposefully withheld potentially exculpatory evidence from the defense. *See Walker*, 624 P.2d at 688–91. This is a far different circumstance. Here, the only information withheld from the jury was the fact that Jordan's admissions also implicated Terril; it certainly was not exculpatory.[13] The United States Supreme Court has

---

13. Terril would only have been harmed by admission of the redacted portions, since these directly implicated him. The State had evidence

that Jordan made the following admissions implicating Terril: Jordan admitted that "he, his brother, and his girlfriend took the victim to a

supported the admission of redacted testimony as a legitimate means in a joint trial to introduce the confessions of one defendant without implicating another. *See Richardson*, 481 U.S. at 207–08, 107 S.Ct. 1702; *see also State v. Nield*, 804 P.2d 537, 539–40 (Utah Ct.App.1990). The fact that in this case the redacted testimony was offered through leading questions to live witnesses, rather than through reading of pre-recorded redacted testimony, in no way made the testimony less reliable. To the contrary, having a live witness available to correct any inaccuracies in the proffered statements made the testimony more sound.[14] We therefore find Terril's claim that the limiting methods undermined the integrity of the trial wholly without merit.

### C. Admission of Jordan's Confessions to Ernst and Mulvey

¶ 40 Terril's final claim is that the trial court improperly denied his motions for a mistrial. Terril first moved for a mistrial after Ernst testified that Jordan had told her that he told Gentry "what him and Terril had done," arguing that this testimony violated his rights under the confrontation clause of the United States Constitution. Second, after the close of all the evidence, Terril again moved for a mistrial, claiming that the jury would improperly consider evidence of Jordan's guilt as against Terril.

¶ 41 On appeal, Terril does not make precisely the same claims. Instead, he argues that Ernst's testimony and the testimony of Michael Mulvey ("Mulvey") directly indicated that Terril committed the crime. Therefore, Terril argues, his right to confront the witnesses against him was violated.

¶ 42 Whether testimony was admitted in violation of defendant's right to confrontation is a question of law, which we review for correctness. *See State v. Heaps*, 2000 UT 5, ¶ 12, 999 P.2d 565. The decision to grant or deny a mistrial, however, rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *See State v. Kohl*, 2000 UT 35, ¶ 20, 999 P.2d 7. We review the trial court's finding that the testimony was not prejudicial and did not warrant a mistrial for abuse of discretion.

¶ 43 At trial, Mulvey, who had been in jail with Jordan, confirmed that Jordan had admitted to him that "he [i.e., Jordan] and his girlfriend were present when the victim was killed." Terril asserts that this statement directly implicated him. The statement, however, makes no reference to Terril and, in isolation, does not imply that Terril was present during the killing or had any part in it, nor does it indicate, expressly or impliedly, that it has been altered. *Cf. Gray v. Maryland*, 523 U.S. 185, 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998) (finding confrontation clause violated where accomplice's confession was redacted to replace defendant's name with the word "deleted"). The only way in which the statement could have prejudiced Terril is its connection to other evidence against him. *See Richardson*, 481 U.S. at 208, 107 S.Ct. 1702 (holding that "inferentially incriminating" statements do not violate confrontation clause when jury is instructed to consider them only against declarant); *see also State v. Ellis*, 748 P.2d 188, 190 (Utah 1987) ("To invoke the *Bruton* doctrine, a statement must be powerfully and

country road"; that "he, his brother, and his girlfriend were present when the victim was killed"; that "he, his brother, and his girlfriend took the victim on a road between Monticello and the Colorado state line and shot him 19 times"; that "he and his brother took the victim while the girl stayed at the car"; that "after the shooting him and his brother split up"; that "they went into the woods and shot him up"; that "they tortured him [and] they shot him up." At trial, the statements were redacted to remove reference to Terril, i.e., "his brother" (referring to Terril) was omitted, and "they" (referring to both brothers) was replaced with "he" (referring

to Jordan). The State also offered evidence of a number of admissions that implicated Jordan alone.

14. The only limit the trial court placed on cross examination was that Jordan's counsel could not evoke testimony that the statements implicated Terril. This limit can hardly be said to have prevented the witnesses from testifying fully and accurately. *Cf. State v. Villarreal*, 889 P.2d 419, 423–24 (Utah 1995) (finding confrontation clause violated where State's witness was utterly nonresponsive and prosecution used a series of leading

facially incriminating with respect to the other defendant and must directly, rather than indirectly, implicate the complaining defendant in the commission of the crime." (citations omitted)). Since the jury was instructed to consider this evidence only against Jordan, and since the statement did not expressly implicate Terril, "the trial court could properly assume that the jury did not use it against [Terril]." *Richardson*, 481 U.S. at 208 n. 3, 107 S.Ct. 1702. We therefore conclude that the testimony of Mulvey did not violate Terril's right to confrontation.

¶ 44 The statement of Jordan recounted by Ernst, on the other hand, did directly implicate Terril. Ernst expressly identified Terril when she stated Jordan admitted telling Gentry "what him and Terril had done." The United States Supreme Court has held that before a hearsay statement that directly implicates a defendant may be admitted, the confrontation clause requires a showing that the declarant is unavailable and that there are adequate indicia of reliability to support the statement. *See Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). The Court has stated that reliability may be inferred (1) if the evidence falls within "a firmly rooted hearsay exception" or (2) if there is a showing of "particularized guarantees of trustworthiness." *Id.* As Terril notes, the Supreme Court has held that the statement against penal interests exception to hearsay is not "firmly rooted" for the purposes of the confrontation clause. *Lilly v. Virginia*, 527 U.S. 116, 134, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). Thus, the fact that Jordan's statement was against his penal interests when made does not give it adequate indicia of reliability. The Court has also held that admissions that implicate an accomplice are inherently suspect and must be presumed unreliable. *Id.* at 132–37, 119 S.Ct. 1887. This presumption may be rebutted in an "exceptional case" where " 'the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility.' " *Id.* at

136, 119 S.Ct. 1887 (quoting *Idaho v. Wright*, 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)). The State has given us no cause to presume this to be such an exceptional case.[15] We therefore find no "particularized guarantees of trustworthiness" to overcome the presumption of unreliability. Since the statement directly implicated Terril, Terril had no opportunity to confront Jordan, and there is no cause to find the statement inherently reliable, we must conclude that Terril's right to confrontation was violated by admission of the statement.

¶ 45 Notwithstanding error by the trial court, we will not reverse a conviction if we find that the error was harmless. *See State v. Villarreal*, 889 P.2d 419, 425 (Utah 1995). Where the error results in the deprivation of a constitutional right, we apply a higher standard of scrutiny, reversing the conviction unless we find the error harmless beyond a reasonable doubt. *see id.; See also State v. Kell*, 2002 UT 19, ¶ 15, 440 Utah Adv. Rep. 20, 2002 WL 193025; *State v. Hackford*, 737 P.2d 200, 204 (Utah 1987); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

¶ 46 The trial court determined that admission of Jordan's statement to Ernst was merely cumulative, and did not have a substantial impact on the outcome of the trial. We agree. Where evidence admitted in violation of defendant's right to confrontation is merely cumulative, it may be deemed harmless beyond a reasonable doubt. *See Harrington v. California*, 395 U.S. 250, 253–54, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). In addition to relating Jordan's admission, Ernst testified (1) that after they stopped at Ucolo Road she heard gun shots coming from where Terril, Jordan, and Eaton were, (2) that during the shots she heard Eaton crying, "Why did you kill me?", (3) that after the shooting Terril stated that Eaton did not immediately fall when he shot him and that he had thought he might have to kick Eaton over, (4) that after the killing Jordan and

questions to imply that witness had made certain admissions).

15. The State does point to evidence corroborating Ernst's testimony. However, "that other evidence at trial corroborated portions of [Ernst's]

statements is irrelevant." *Lilly*, 527 U.S. at 137, 119 S.Ct. 1887. The necessary guarantees of trustworthiness must be based upon the circumstances under which the declarant made the statement. *Id.* at 136–37, 119 S.Ct. 1887.

Terril split up to establish an alibi for each of them, and (5) that Jordan later showed her two blood-spattered guns, one of which was Terril's. If the jury believed these elements of Ernst's testimony, then her recounting of Jordan's admission was inconsequential. Indeed, Ernst's testimony about Terril's explicit admission clearly overshadows the vague confession by Jordan that he told Gentry "what him and Terril had done." Given Ernst's detailed testimony, in combination with the other evidence offered against Terril at trial, we are confident that the error in admitting Jordan's unredacted confession was harmless beyond a reasonable doubt. We therefore uphold the trial court's denial of Terril's motions for mistrial.

### IV. REMOVAL OF JURORS

¶ 47 Terril claims that the trial court improperly removed prospective jurors # 8 and # 53 for cause. While Terril concedes that both of these jurors expressed certain biases during voir dire, he asserts that the trial court should have determined that these jurors could set aside their biases and view the evidence impartially. Terril claims that removal of the potential jurors was prejudicial because these persons "would have been highly valuable jurors, with a demonstrated, unique and strong desire to serve conscientiously." Further, he asserts that because the trial court removed one juror sua sponte and both without cause, the trial court effectively gave the prosecution two extra peremptory challenges. This imbalance in peremptory challenges, Terril claims, must be presumed prejudicial. We review a trial court's determination whether to remove a juror for cause for an abuse of discretion. *See State v. Archuleta,* 850 P.2d 1232, 1240 (Utah 1993). Under this standard, we will not reverse the trial court's ruling unless we find that the ruling was beyond reason. *See id.* In our review, we "look to the entire voir dire exchange with the challenged juror." *State v. Lafferty,* 2001 UT 19, ¶ 58, 20 P.3d 342. Even upon finding that a trial court erroneously excluded a juror for cause, we will not reverse the jury verdict if we find the error was harmless. *Cf. Archuleta,* 850 P.2d at 1240; *State v. Seyboldt,* 65 Utah 204, 236 P. 225, 229

(1925); *see also State v. Wach,* 2001 UT 35, ¶ 24, 24 P.3d 948 (harmless error analysis where court failed to remove juror for cause); *State v. Menzies,* 889 P.2d 393, 398 (Utah 1994) (same). To show prejudice, appellant must demonstrate that the jury that actually sat for the trial was in some way partial or incompetent. *See Wach,* 2001 UT 35 at ¶¶ 24, 36, 24 P.3d 948.

¶ 48 We first consider whether the trial court abused its discretion in removing jurors # 8 and # 53. Under the Utah Rules of Criminal Procedure, a potential juror may be challenged for cause if the juror expresses an inability to view the evidence impartially. The rule specifically gives the following as grounds for a challenge for cause:

(4) the existence of any social, legal, business, fiduciary or other relationship between the prospective juror and any party, witness or person alleged to have been victimized or injured by the defendant, which relationship when viewed objectively, would suggest to reasonable minds that the prospective juror would be unable or unwilling to return a verdict which would be free of favoritism.

. . .

(13) having formed or expressed an unqualified opinion or belief as to whether the defendant is guilty or not guilty of the offense charged; or

(14) that a state of mind exists on the part of the juror with reference to the cause, or to either party, which will prevent him from acting impartially and without prejudice to the substantial rights of the party challenging. . . .

Utah R.Crim. P. 18(e).

¶ 49 We have stated that "trial judges should err on the side of caution in ruling on for-cause challenges," *State v. Saunders,* 1999 UT 59, ¶ 51, 992 P.2d 951, and that " 'it is a simple matter to obviate any problem of bias simply by excusing the prospective juror and selecting another,' " *Wach,* 2001 UT 35 at ¶ 25, 24 P.3d 948 (quoting *Jenkins v. Parrish,* 627 P.2d 533, 536 (Utah 1981)). When a potential juror makes statements that raise a question about her ability to be impartial, the trial court must

"either excuse her or further question her about these relationships and determine whether she could act impartially." *State v. Cox*, 826 P.2d 656, 660 (Utah Ct.App.1992). An inference of bias may be rebutted "by a showing that the statement was merely the product of a 'light impression' and not one that would 'close the mind against the testimony that may be offered in opposition.'" *State v. Bishop*, 753 P.2d 439, 451 (Utah 1988) (quoting *State v. Bailey*, 605 P.2d 765, 768 (Utah 1980)). A juror's subsequent statements that she can be impartial will not of itself attenuate the inference of bias. *See Cox*, 826 P.2d at 660. "The court, not the juror, must determine the juror's qualification." *State v. Jones*, 734 P.2d 473, 475 (Utah 1987).

¶ 50 Both jurors # 8 and # 53 made statements that raised an inference of bias, and both later made qualified statements that they felt they could be impartial. Juror # 8 stated in his jury questionnaire that he believed he could not be impartial because he was "close personal friends" with the Calliham brothers' paternal and maternal grandparents. The court and counsel then questioned the prospective juror, who gave ambiguous answers about his ability to judge the evidence impartially. Asked if he could be fair to both the State and defendants, the juror replied, "I think that I could be fair, but I think that I would have a very hard time, ah, serving in that capacity." Asked if jury service would merely make him "uncomfortable," the juror said, "That's basically it." The court then asked if the juror would hesitate to find defendants guilty even if he found the charges were proved. "I would hesitate, yes," Juror # 8 stated. "But beyond a reasonable doubt, I think that the courts are set up to that way and that's what I believed all my life. If it was beyond a reasonable doubt, then I think that I would have to." Asked if his relationship with the grandparents would be irrelevant, the juror stated, "Basically and honestly I think that it might affect me in the very long run. That's why I put that on the questionnaire. I know these people. They're my friends." Later in the exchange, however, the juror stated that he did not think jury service would jeopardize

his relationship with the grandparents. The juror also stated that he was unsure if he could be the cause of a hung jury if he found the charges were not proved. He then, however, made statements suggesting the opposite.

¶ 51 Terril claims that Juror # 8 was removed merely because he was "uncomfortable" serving as a juror. Terril also argues the trial court should have questioned the juror further concerning his statements regarding a hung jury. We disagree. Given the juror's friendship with the Calliham brothers' grandparents, the juror's statement that he would "have a hard time" judging fairly "went beyond the discomfort that many jurors experience when rendering judgment." *State v. Saunders*, 1999 UT 59, ¶ 50, 992 P.2d 951. "A juror is not in any position to weigh the evidence of his friend against the evidence of strangers and ... [thereby to] stand indifferent between the state and the accused. Where there have been personal associations, such as the ones here; to remain uninfluenced, unbiased, and unprejudiced; runs counter to human nature." *State v. Brooks*, 563 P.2d 799, 802 (Utah 1977). We find the court did not abuse its discretion in determining that the juror's ambiguous and contradictory statements were insufficient to rebut the inference of bias. The court was not obliged to inquire further into the juror's attitudes regarding hung juries. The trial court properly erred on the side of caution in excusing the juror.

¶ 52 Juror # 53 also made statements raising an inference of bias. Of particular concern was her involvement with and knowledge of the case and counsel. An attorney, Juror # 53 stated that she had discussed this case with and had given Jordan's counsel "some ideas" on making a change of venue motion early in the proceedings. She also stated that she had been in court during some of the pretrial motions concerning the Calliham brothers, though she could not remember the specific motions. She remembered seeing Jordan and Terril in court and "being struck by the youth of both defendants." She stated that she knew the victim died of gunshot wounds, that she knew the Calliham brothers were charged with a first-

degree felony, and that she thought (albeit mistakenly) that, if convicted, Jordan and Terril each could be sentenced to 15–years–to–life in prison.

¶ 53 In addition, she stated that she had "locked horns" with both the prosecutor and Jordan's counsel on prior occasions. The juror agreed that she had been involved with "a number of cases" brought by the prosecutor. *Cf. State v. Cobb*, 774 P.2d 1123, 1126 (Utah 1989) (potential juror's "brief acquaintance" with prosecutor was insufficient to warrant inference of bias). Asked if she disagreed with the prosecutor's approach to drug cases, she stated, "I disagree with the approach of your office." The juror refused to admit that there was animosity between her and the prosecutor, but stated "I think we have differences of opinion and sometimes it gets heated. It's a heated battle when things get said."

¶ 54 Finally, the juror expressed an inability to weigh the evidence impartially. On her juror questionnaire, she stated that she would not be able to pass judgment on the youngest defendant, i.e., Jordan, because he would most likely be victimized in prison. She also stated that she was uncertain if she could judge fairly because she knew someone who had been friends with the victim. During voir dire, the juror backed away from both of these statements, but still expressed some hesitance about her ability to be impartial. Asked if she could be fair and impartial in following the court's instructions, the juror stated, "I think it would be difficult, but I think I would do that." Later, when asked if she could set aside her biases, she stated, "I think it would be real hard."

¶ 55 Terril asserts that the juror's contact with the legal proceedings in the case was too minimal to raise an inference of bias. We disagree. Although the juror could not remember the details of the motions she had seen or assisted with, evidence presented at trial may have refreshed her memory of factors outside the scope of the trial. Further, the juror's past associations with the prosecutor brought into question her ability to be impartial. Under rule 18 of the Utah Rules of Criminal Procedure, a juror may be challenged for cause if there exists a relationship, which "when viewed objectively, would suggest to reasonable minds that the prospective juror would be unable or unwilling to return a verdict which would be free of favoritism." Utah R.Crim. P. 18(e)(4). While it is difficult to ascertain from the record the extent of any antipathy between the juror and the prosecutor, there is sufficient evidence of prior tension to raise a question of bias in reasonable minds. Although the juror's statements on their face expressed no animosity, the transcript suggests that she was notably less cooperative at voir dire when questioned by the prosecutor than when questioned by defense counsel or the court. Finally, her past assistance to Jordan's counsel suggests a possible bias in favor of the defense. In light of this record, we see no cause to fault the trial court's decision to eliminate this juror from the panel.

¶ 56 Terril also claims the trial court erred in the procedure it used to exclude Juror # 53. The court began voir dire by asking Juror # 53 about statements she made in the jury questionnaire. The court then stated, before either party had made a challenge to the prospective juror, "I think I'm going to excuse her. You may try to rehabilitate if you like." After additional voir dire by defense counsel, the prosecution, and the court, the trial judge stated, "I'm going to excuse her, unless you want me to keep her [Mr. Prosecutor]. If you all agree, I'll leave her on." On appeal, Terril asserts that the trial judge should not have sua sponte considered whether to excuse Juror # 53 for cause and, after finding cause to remove that juror, offered to retain the juror if the prosecution so desired.

¶ 57 Although rule 18(e) appears to contemplate challenges for cause being raised by the parties, there is nothing in the rule that suggests a trial court must wait to consider whether to remove an obviously biased juror until a party has made a motion. Utah R.Crim. P. 18(e). We have stated that "[t]he trial court undoubtedly has the power, of his own motion, to dismiss a juror lacking the statutory qualifications. . . ." *State v. Seyboldt*, 65 Utah 204, 215, 236 P. 225, 229 (1925). The trial court's responsibility to

seat an impartial jury carries with it the discretion to question prospective jurors who appear unqualified, notwithstanding the lack of any objections from the parties. Although we have found error where the trial court sua sponte removed a juror for cause without making any indication in the record of why the juror was being removed, *see id.*, that is not the case here. The court specifically identified its rationale for excusing this juror:

[The juror has] given reasons why she might judge the defendants more harshly; and then in her questionnaire she said, "I wouldn't be able to pass judgment on the younger defendant." She's been in court during some of the motions. She has a relationship, which is not necessarily very good, with two of the lawyers involved in the case.

¶ 58 We also find that the trial court's offer to retain Juror # 53 if the prosecution so desired does not constitute reversible error.[16] Because the prosecutor did not request to retain Juror # 53, and because there were adequate grounds for removing this juror for cause, the result is exactly the same as if the prosecutor had challenged Juror # 53 and the court had considered the challenge and correctly concluded that this juror should be removed. No prejudice resulted from the court's approach.

¶ 59 Having concluded that the trial court properly excused these jurors, we need not consider whether improper removal of jurors would be equivalent to granting the opposing party an extra peremptory challenge. We hold the trial court did not abuse its discretion in removing the jurors for cause.

## V. PROSECUTORIAL MISCONDUCT

¶ 60 Terril claims the prosecutor incorrectly stated the law in his closing argument. This misconduct, Terril asserts, should be presumed to have improperly influenced the jury, and entitles him to a new trial. After

arguing that there was sufficient evidence to find Terril guilty of criminal homicide, the prosecutor argued that, even if the jury found that Terril had a limited involvement in the murder, Terril still might be found guilty as an accomplice:

I'm not asking you to believe there was only one shooter here and there was [sic] two guns and one shooter, but what I'm saying is even if you believe it, Instruction No. 6 says "One who does not actually commit a crime, but who aids, solicits, encourages or commands another in the commission of a crime may be convicted of a crime as an accomplice." *Well if that person intends that it be committed.* Aids, solicits, encourages, commands. Terril Calliham was standing right there. You can still find Terril guilty under that right there if he helped in this in any way if he provided a gun, if he helped him get away, if he tried to help him with an alibi.

(Emphasis added.)

¶ 61 We will reverse a jury verdict because of prosecutorial misconduct if we find the prosecutor's remarks were improper and harmful to defendant. *State v. Colwell*, 2000 UT 8, ¶ 39, 994 P.2d 177; *State v. Tarafa*, 720 P.2d 1368, 1372 (Utah 1986). A prosecutor's remarks will be considered improper if the remarks "called to the juror's attention matters which they would not be justified in considering in reaching a verdict." *State v. Emmett*, 839 P.2d 781, 785 (Utah 1992) (quoting *State v. Johnson*, 663 P.2d 48, 51 (Utah 1983)). Improper remarks will be deemed harmful if the jury was, "under the circumstances of the particular case, probably influenced by those remarks." *State v. Troy*, 688 P.2d 483, 486 (Utah 1984) (quoting *State v. Valdez*, 30 Utah 2d 54, 60, 513 P.2d 422, 426 (1973)); *see also State v. Kohl*, 2000 UT 35, ¶ 22, 999 P.2d 7 (stating prosecutor's statements harmful if they manifest error that " 'is substantial and prejudicial such that

---

16. Terril claims that this offer manifested the trial court's favoritism to the prosecution and its uncertainty whether Juror # 53 should be removed for cause. We disagree. Contrary to Terril's suggestion, the trial court asked for input from both parties whether to keep Juror # 53. He stated, "If you all agree, I'll leave her on." Furthermore, there are a number of explanations

for why this offer was made first and more specifically to the prosecution: Defense counsel had already indicated that they wanted to keep this juror; the juror had made statements primarily suggesting bias against the State's position; and, according to rule 18, the prosecutor is to be given the opportunity to challenge for cause before the defense. Utah R.Crim. P. 18(c)(2).

there is a reasonable likelihood that, in its absence, there would have been a more favorable result.'" (quoting *State v. Longshaw,* 961 P.2d 925, 928 (Utah Ct.App.1998))).

¶ 62 Because Terril did not object to the prosecutor's remarks at trial, he relies upon the doctrines of plain error and ineffective assistance of counsel in this appeal. To obtain reversal under these doctrines, Terril must show either (1) that the prosecutor's comments were so obviously improper that the trial court had an opportunity to address the error, *see Emmett,* 839 P.2d at 785; *State v. Dunn,* 850 P.2d 1201, 1208 (Utah 1993), or (2) that in failing to object to the prosecutor's remarks, his counsel's performance "fell below an objective standard of reasonable professional judgment," *State v. Chacon,* 962 P.2d 48, 50 (Utah 1998). In addition, under either doctrine, Terril must show that the error was harmful. *See, e.g., id.* (ineffective assistance of counsel); *Emmett,* 839 P.2d at 785 (plain error).

¶ 63 Terril asserts that the prosecutor's comments incorrectly suggested that, under the law, Terril could be found guilty as an accomplice based solely on a finding that Terril was present when the crime occurred, provided a gun to Jordan, helped Jordan escape, or assisted in providing Jordan with an alibi. This argument was incorrect, Terril claims, because it implied that the jury could find Terril guilty based solely on his presence at the crime scene and without a finding that he intended that the murder result.

¶ 64 Terril correctly asserts that accomplice liability adheres only when the accused acts with the mens rea to commit the principal offense. Utah's accomplice liability statute specifically requires that the person act intentionally:

> Every person, acting with the mental state required for the commission of an offense ... who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct.

Utah Code Ann. § 76–2–202 (2001); *see also State v. Holgate,* 2000 UT 74, ¶ 20, 10 P.3d 346; *State v. Schreuder,* 726 P.2d 1215, 1220

(Utah 1986); *State v. Comish,* 560 P.2d 1134, 1136 (Utah 1977). He is also correct that mere presence at the scene of a crime is not enough to impose accomplice liability. One must take some action to solicit, request, command, encourage, or intentionally aid in commission of the offense. *See American Fork City v. Rothe,* 2000 UT App 277, ¶ 7, 12 P.3d 108; *In re V.T.,* 2000 UT App, 189, ¶ 11, 5 P.3d 1234.

¶ 65 We do not agree, however, that the prosecutor's statements actually suggested that Terril could be convicted as an accomplice without a showing that he intentionally took some action to assist in the crime. The prosecutor did not state that Terril could be found guilty if the jury found he was merely present at the crime; rather, he stated Terril could be found guilty only "if he helped" Jordan commit the crime "if he provided a gun, if he helped him get away, if he tried to help him with an alibi." Further, the prosecution noted the mens rea requirement for accomplice liability. The prosecutor stated that an aider and abettor may be found guilty of the principal crime "if that person intends that it be committed." Furthermore, we assume that the jury was properly instructed by the court on the intent element of accomplice liability, and was therefore unlikely to be misled by a single sentence from the prosecutor's argument, taken out of context.

¶ 66 Even if the prosecutor's remarks were confusing or misleading on the intent issue, there was no likelihood of prejudice to Terril. In making this determination, we look to the case as a whole. *See State v. Troy,* 688 P.2d 483, 486 (Utah 1984). If proof of defendant's guilt is strong, we will not presume prejudice; if there is less compelling proof, we will more closely scrutinize the prosecutor's conduct. *Id.* Further, "[i]f the conclusion of the jurors is based on their weighing conflicting evidence or evidence susceptible to differing interpretations, there is a greater likelihood that they will be improperly influenced through remarks of counsel." *Id.*

¶ 67 In this case, the evidence against Terril consisted of the testimony of Ernst implicating him in the murder, and proof that he

was in possession of guns similar to those used in the crime. Ernst's testimony was in conflict with testimony from other witnesses, who stated that Terril was bailing hay or at a party at the time the crime was said to have taken place. Terril never argued, nor did he offer any evidence that he was merely present at the murder or only assisted Jordan after the crime.[17] Rather, Terril defended by offering alibi evidence and attacking Ernst's credibility. Thus, the jury had no evidence from which they could conclude that Terril merely helped Jordan get away or helped with an alibi. Under these circumstances, it is extremely unlikely that the jury found Terril guilty as an accomplice without the necessary intent. They were properly instructed on the law and must be presumed to have followed it.

## VI. READING OF TRIAL TRANSCRIPT TO THE JURY

¶ 68 Terril claims that the trial court erred when, after deliberations had begun and at the jury's request, it read back portions of the trial transcript.[18] Terril argues that the court's reading of the transcript violated rule 17 of the Utah Rules of Criminal Procedure, which, he asserts, does not permit a court to read back portions of the trial transcript. Further, Terril claims that the trial court gave the prosecution undue advantage by choosing to read portions of the transcript that he claims were more favorable to the State.

¶ 69 When the jury first requested to see the transcript, the trial court recognized that no official transcript was yet available and asked counsel whether they opposed providing the jury with a videotape of the proceedings. Both Terril and Jordan objected and the court ruled that the tape would not be provided. Later, after the jury had deliberated for twelve hours and was prepared to render a verdict on the charges against Jordan, the jury again requested a portion of the transcript. The court indicated that it planned to read two portions of the transcript to the jury. Asked if there were any objections, Terril's counsel and the prosecutor each stated, "No."

¶ 70 We have often stated that " 'issues not raised at trial cannot be argued for the first time on appeal' .... unless the petitioner demonstrates that 'plain error' occurred or 'exceptional circumstances' exist." *Monson v. Carver*, 928 P.2d 1017, 1022 (Utah 1996) (quoting *State v. Lopez*, 886 P.2d 1105, 1113 (Utah 1994)). We do not consider all rulings objected to for the first time on appeal under the plain error doctrine. *E.g.*, *State v. Bullock*, 791 P.2d 155, 158 (Utah 1989). "[I]f a party through counsel has made a conscious decision to refrain from objecting or has led the trial court into error, we will then decline to save that party from the error." *Id.*; *see also State v. Emmett*, 839 P.2d 781, 785 (Utah 1992). Such a result is necessary to ensure the fairness of appellate review. *See Bullock*, 791 P.2d at 159. "Defendants are thus not entitled to both the benefit of not objecting at trial and the benefit of objecting on appeal." *Id.*; *State v. Brown*, 948 P.2d 337, 343 (Utah 1997).

¶ 71 Terril made no objection at trial to the reading of the transcript and, indeed, affirmatively led the court to believe that he did not oppose the reading. In addition, on appeal he has argued neither plain error nor exceptional circumstances. We therefore decline to address this claim.

17. Terril did offer evidence that the pattern of shells found at the crime scene would be consistent with either one or two persons shooting the victim. Terril never argued, however, that he was at the crime scene but did not fire at Eaton.

18. Terril also claims that we should reverse his conviction due to "actual bias" of the trial judge. When the jury first asked the court to read a portion of the transcript, the judge refused, telling the jury that the court did not want to risk that "the decision [the jury] ultimately make[s] will be overturned on appeal." Terril claims that the judge's reticence signaled to the jury that the court thought Terril was guilty and didn't want a guilty verdict overturned. Terril's argument is frivolous. We find absolutely no evidence of judicial bias in the trial transcript. The judge made quite clear that he was refusing the jury's request because he did not have an official transcript available and did not want to provide an unofficial version that might later be deemed improper. The court gave no indication that it thought the jury would or should find Terril guilty.

## CONCLUSION

¶ 72 The trial court did not abuse its discretion in denying the motion for a psychological examination of the State's primary witness. Any error in admitting the redacted statements of Jordan was harmless beyond a reasonable doubt to Terril. The trial court did not err in denying Terril's motion to sever or his motion for a mistrial, nor did it err in redacting Jordan's statements, allowing counsel to lead the witnesses, and limiting the scope of cross examination. The trial court did not abuse its discretion in removing two prospective jurors for cause. The prosecutor's remarks to the jury during closing arguments were harmless. Finally, Terril failed to preserve his claim that the trial court erred in reading certain passages of the trial transcript to the jury. We therefore affirm his conviction.

¶ 73 Associate Chief Justice DURRANT, Justice HOWE, Justice RUSSON, and Justice WILKINS concur in Chief Justice DURHAM's opinion.